*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ALASKA POLICY FORUM, ) | |
| ) | Supreme Court No. S-18533 |
| Appellant, ) | |
| ) | Superior Court No. 3AN-21-07137 CI |
| v. ) | |
| ) | O P I N I O N |
| ALASKA PUBLIC OFFICES ) | |
| COMMISSION; YES ON 2 FOR ) | No. 7801 – February 13, 2026 |
| BETTER ELECTIONS; and PROTECT ) | |
| MY BALLOT, ) | |
| ) | |
| Appellees. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Frank A. Pfiffner, Judge.

Appearances: Stacey C. Stone, Holmes Weddle & Barcott, PC, Anchorage, and Steve Shevorski, Adam J. Tragone, and Charles Miller, Institute for Free Speech, Washington, DC, for Appellant. Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee Alaska Public Offices Commission. Samuel G. Gottstein and Scott M. Kendall, Cashion Gilmore & Lindemuth, Anchorage, for Appellee Yes on 2 for Better Elections. No appearance by Appellee Protect My Ballot.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

BORGHESAN, Justice.

# I.    INTRODUCTION

"The effective functioning of our democratic form of government is premised on an informed electorate. When citizens vote on the basis of misinformation, or a lack of relevant information, the decision-making process on which our government ultimately rests suffers to that extent."[1]

To promote an informed electorate, Alaska law requires public reporting of expenditures made for the purpose of influencing the outcome of a ballot proposition, through which the voters directly exercise legislative power. Alaska law also requires that advertisements and announcements pertaining to ballot propositions state who paid for the communication. Voters can use that information to evaluate the messages they hear.

In this case a nonprofit organization disseminated materials criticizing ranked-choice voting in the months before an election that featured a ballot proposition that proposed to adopt ranked-choice voting and other significant changes to Alaska's election laws. The state agency charged with enforcing Alaska's campaign finance laws determined that the organization failed to comply with the law because it did not report its spending on these materials or place a "paid for by" disclosure on them. The organization appealed to the superior court, which affirmed the agency's decision.

The organization now appeals to us. It argues that the agency wrongly determined that its materials are subject to reporting and disclosure laws, that the legal standards applied by the agency are unconstitutionally vague, and that aspects of Alaska's reporting and disclosure laws violate the First Amendment. We uphold the agency's decision, concluding that the cited publications had to be reported and required a "paid for by" disclosure. We also hold that the statutory standards are not unconstitutionally vague because they give fair notice of what kind of speech must be

---

[1]    *Messerli v. State*, 626 P.2d 81, 86 (Alaska 1980).

reported and must contain a disclosure. And we conclude that the First Amendment challenges to these laws are unavailing.

## II. FACTS AND PROCEEDINGS

### A. Alaska Campaign Finance Law

Alaska law regulates spending on both candidate elections and ballot propositions.[2] The Alaska Public Offices Commission (the Commission) is the state agency that applies and enforces these campaign finance laws.[3] These laws impose three basic requirements on those who spend money to influence elections: reporting, registration, and disclosures.[4]

First, expenditures made to influence the outcome of a ballot proposition must be reported to the Commission.[5] Every person making an expenditure for this purpose must "make a full report of expenditures made and contributions received, . . . unless exempt from reporting."[6] The report must include the person's "name, address, principal occupation, and employer," the name of the proposition, "whether the expenditure is made to support or oppose the . . . ballot proposition," and a list of donations the person may have received "for the purpose of influencing the outcome of

---

[2]    *See, e.g.*, AS 15.13.010–.400.

[3]    AS 15.13.020; AS 15.13.030.

[4]    *See* AS 15.13.040 (reporting); AS 15.13.050 (registration); AS 15.13.090 (disclosures).

[5]    AS 15.13.040; former AS 15.13.400(6)(A)(iv) (2020).

Ballot Measure 2, which took effect in February 2021, added new definitions to AS 15.13.400, resulting in the renumbering of some relevant definitions. The terms of the existing definitions were not altered. We cite to the statutory definitions as numbered when the events relevant to this dispute occurred, prior to the 2021 renumbering.

[6]    AS 15.13.040(d); AS 15.13.140(b).

an election."[7]  If the person is a corporation or group, rather than an individual, the report must also include "the name and address of each officer and director."[8]  However, spending by individuals "acting independently of any other person" that "cumulatively do[es] not exceed $500 during a calendar year" and goes toward "billboards, signs, or other printed material concerning a ballot proposition" is exempt from reporting.[9]

Second, Alaska law requires persons to register with the Commission before making an expenditure related to a ballot proposition.[10]  Individuals are exempt from this registration requirement.[11]

Third, certain election-related "communications" must include a disclosure identifying the person who paid for the communication.[12]  The campaign finance statutes define a "communication" as "an announcement or advertisement disseminated through print or broadcast media, including radio, television, cable, and satellite, the Internet, or through a mass mailing."[13]  But the definition excludes announcements and advertisements "by an individual or nongroup entity and costing $500 or less" and those that "do not directly or indirectly identify a candidate or proposition."[14]  Those exempted categories of speech need not include a disclosure.

Communications that must include a disclosure must "be clearly identified by the words 'paid for by' followed by the name and address of the person paying for

---

[7]      AS 15.13.040(e).

[8]      AS 15.13.040(e)(4).

[9]      AS 15.13.040(h).

[10]     AS 15.13.050(a).

[11]     *Id.*

[12]     AS 15.13.090(a).

[13]     AS 15.13.400(3) (2020).

[14]     *Id.*

the communication."[15] If the communication is made by an entity other than an individual or a candidate, the disclosure must identify the entity's principal officer, include "a statement from the principal officer approving the communication," and name the identity and state of residence or principal place of business "of each of the person's three largest contributors . . . during the 12-month period before the date of the communication."[16]

With this framework in mind, we turn to the facts of the dispute.

## B. Facts

Alaska Policy Forum (APF) is a 501(c)(3) nonprofit corporation incorporated in 2009. APF's self-described mission is to "provide research, information and public education in support of individual rights, limited government, personal responsibility and government accountability."

In July 2019 some Alaska residents proposed to enact major changes to Alaska's election laws via voter initiative.[17] This initiative, called "Alaska's Better Elections Initiative" (the Initiative), proposed to (1) replace Alaska's party primary system with an open nonpartisan primary, (2) require additional disclosures from "independent expenditure" groups, and (3) establish ranked-choice voting for the general election. Proponents of this initiative began collecting signatures a few months later. The lieutenant governor accepted the petition in March 2020, scheduling the Initiative for a vote in the November 2020 election.

---

[15] AS 15.13.090(a).

[16] AS 15.13.090(a)(2).

[17] Alaska Const. art. XI, § 1 ("The people may propose and enact laws by the initiative, and approve or reject acts of the legislature by the referendum."). While the constitution uses the term "initiative," the statutes describe the proposed legislation to be voted on by the electorate as a "ballot proposition." *See* AS 15.45.180 (explaining that if petition for voter initiative is properly filed, lieutenant governor "shall prepare a ballot title and proposition"); AS 15.45.190 (directing lieutenant governor "to place the ballot title and proposition on the election ballot").

In January 2020 — before the Initiative was accepted but after its proponents began collecting signatures — APF joined nonprofit think tanks from four other states to create Protect My Ballot, a coalition formed to educate the public about the risks of ranked-choice voting. In February 2020 APF republished on its website an opinion piece by a writer from Maine, where ranked-choice voting had already been enacted. The opinion piece was critical of ranked-choice voting.[18]

Protect My Ballot launched an education campaign about ranked-choice voting on July 24, 2020. APF emailed a press release announcing the campaign to a national media list and to an Alaska-specific media list. The press release was entitled "Protect My Ballot: New Campaign Exposes Flaws in Ranked Choice Voting." Noting that the campaign was "led by Alaska Policy Forum," the press release explained that the campaign "highlights bipartisan opposition to" ranked-choice voting. The release included the following statement from APF's executive director:

> As Alaskans take to the polls in November, history should provide a warning for what Ranked Choice Voting would lead to. Not only can Ranked Choice Voting cause votes to be discarded, research shows it also decreases voter turnout. We need to encourage Americans of all backgrounds to visit the polls, not give them another reason to avoid casting a ballot.

The release also quoted statements from the leaders of other state think tanks participating in the campaign and linked to a video about ranked-choice voting on Protect My Ballot's website.

A week later APF published the video on its website with the caption: "Ranked-choice voting (RCV) is an electoral scheme that adds more confusion to the

---

[18] Jacob Posik, *Ranked-Choice Voting Fails to Deliver on Its Promises*, ALASKA POL'Y F. (Feb. 11, 2020), https://alaskapolicyforum.org/2020/02/rcv-fails-on-promises/ (archived at https://perma.cc/8EUP-LA4R). The opinion piece originally appeared in the Anchorage Daily News.

voting system while threatening our democracy and failing to ensure that every vote counts."[19] The video described how ranked-choice voting works in pointed language, warning of its downsides, and directed viewers to visit Protect My Ballot's website.[20] The final moments of the video show animated hands holding signs reading: "PROTECT MY VOTE" and "SAY NO TO RANKED CHOICE VOTING."[21]

In October 2020, less than a month before the election, APF published additional materials about ranked-choice voting. On October 8 APF issued a press release announcing a new report on the effects of ranked-choice voting. The press release described the results of the report, including how ranked-choice voting could change the results of elections. Highlighted in bold text in the middle of the press release was a statement by one of APF's officers:

> A voting system that frequently results in the discarding of legally submitted ballots has no place in Alaska or anywhere else in the United States. After researching candidates, going to the polls, and voting, no Alaskan should have to worry that their ballot won't be counted in the final tally.

Finally, on October 12 APF published a short blog post entitled "Ranked-Choice Voting Disenfranchises Voters," authored by an APF intern.[22] The post began: "A voting trend to uproot the electoral process is sweeping the country and has made it all the way to Alaska: ranked-choice voting."[23] The piece described problems with

---

[19] *Video: Ranked Choice Voting, Explained*, ALASKA POL'Y F. (July 31, 2020), https://alaskapolicyforum.org/2020/07/video-rcv-explained/ (archived at https://perma.cc/4PH3-Z9VW).

[20] *Id.*

[21] *Id.*

[22] Johan Soto, *Ranked-Choice Voting Disenfranchises Voters*, ALASKA POL'Y F. (Oct. 12, 2020), https://alaskapolicyforum.org/2020/10/rcv-disenfranchises-voters/ (archived at https://perma.cc/JR6C-XEB3).

[23] *Id.*

ranked-choice voting, including the experiences of other states and cities that had used it. It concluded: "[O]ther cities and states should serve as an example of the complications that arise from implementing RCV. It is critical for our country that elections maintain their integrity, and disenfranchising voters through RCV accomplishes the opposite. All Alaskans deserve to have their votes counted."[24] The post then directed readers to the Protect My Ballot website.[25]

### C. Proceedings

#### 1. Administrative Proceedings

In September 2020 Yes on 2 for Better Elections (Yes on 2), a nonprofit organization, filed a complaint with the Commission regarding APF and Protect My Ballot's activities. Yes on 2 alleged that APF and Protect My Ballot had failed to register with the Commission and to report their expenditures as required by law.

APF denied any campaign finance violations in its answer. Commission staff investigated. In response to the Commission's document requests for a list of expenditures related to ranked-choice voting, APF stated that it had spent $643.20 "in the form of staff time to review educational content, send out press releases, etc." between September 1, 2019 and September 8, 2020.

Commission staff submitted a report to the Commission recommending that it rule that APF had violated the law by failing to report expenditures made to influence the outcome of a ballot proposition, to register before making such expenditures, and to include disclosures on its communications. Staff noted that the legislature had defined the kinds of spending on election-related speech that had to be reported as expenditures. The statutory definition of expenditure "includes an express communication and an electioneering communication, but does not include an issues

---

[24] *Id.*

[25] *Id.*

communication."[26] An "express communication" is "a communication that, when read as a whole and with limited reference to outside events, is susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate."[27] By contrast, an "issues communication" is defined as a communication that "directly or indirectly identifies a candidate" and "addresses an issue of national, state, or local political importance and does not support or oppose a candidate for election to public office."[28] The staff acknowledged that these definitions were specific to candidate elections, not ballot propositions. But staff, citing federal court decisions, reasoned that the definitions provided a useful framework for regulation of spending on ballot propositions.[29]

Applying this framework, staff concluded that APF's publications met the standard for "express communications" that had to be reported. Relying on previous advisory opinions applying this framework,[30] staff highlighted APF's "recent burst of activity against ranked choice voting as the November election approache[d]" and reasoned that APF's activities around ranked-choice voting were express

---

[26]    Former AS 15.13.400(6)(C) (2020).

[27]    Former AS 15.13.400(7) (2020).

[28]    Former AS 15.13.400(12) (2020).

[29]    The report cited *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) and *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088 (9th Cir. 2003).

[30]    *See* AS 15.13.374(a) (providing that any person may request advisory opinion from Commission regarding chapter). The staff report relied on the following: *Renewable Res. Coal.*, AO 08-02-CD (approved June 11, 2008), https://aws.state.ak.us/apocreports/paper/download.aspx?ID=4878 (archived at https://perma.cc/4LT8-RG6P); *Renewable Res. Found.*, AO 13-04-CD (approved June 6, 2013), https://aws.state.ak.us/apocreports/paper/download.aspx?ID=8475 (archived at https://perma.cc/59CZ-8NZ8); and *Bags for Change*, AO 19-04-CD (approved as modified Sept. 18, 2019), https://aws.state.ak.us/apocreports/paper/download.aspx?ID=21018 (archived at https://perma.cc/2JW5-V674).

communications due to their content, timing, and context. Therefore, staff concluded, APF had violated three provisions of AS 15.13 by failing to (1) register with the Commission, (2) file independent expenditure reports, and (3) include "paid for by" disclosures on its communications. Staff recommended dismissing the allegations against Protect My Ballot, however, because the group's website was susceptible to interpretation as a national clearinghouse of information for those opposed to ranked-choice voting in various locales, rather than communications about the Alaska Initiative.

APF disputed the staff's conclusions. APF argued that it had not advocated against the Initiative "as a whole" because it "ha[d] not urged citizens to vote for or against ranked-choice voting" or addressed the other two changes proposed in the Initiative (changes to campaign finance laws and to primary elections). It also argued that the staff had unduly focused on the context of the communications rather than their content.

In subsequent briefing APF argued that the staff report's approach to identifying express communications violated the First Amendment. APF also argued that the Commission's interpretation of the disclosure statutes was unconstitutional because (1) they applied, with some exceptions, regardless of how little money was spent; and (2) requiring disclosures for communications that "indirectly" reference a ballot proposition is unconstitutionally vague.

After a hearing the Commission issued a final order adopting the staff report's conclusions. The Commission found that "at least as of [APF's] July press release," APF had violated AS 15.13.050(a) by not registering before making expenditures opposing a ballot measure, AS 15.13.040(d) and AS 15.13.140(b) by not filing reports on its expenditures, and AS 15.13.090 by not including a "paid for by" disclosure on its communications. But the Commission waived the recommended civil penalty because it was "significantly out of proportion to the degree of harm to the

public for not having the information."[31]  The Commission dismissed the allegations against Protect My Ballot for the reasons explained in the staff report.

### 2.      Superior court proceedings

APF appealed to the superior court.  It argued that (1) the Commission's analysis and use of hyperlinks rather than record exhibits did not adequately support its findings; (2) the Commission had improperly applied the statutory definition of "express communication" to advocacy related to a ballot proposition when the definition applied only to candidate elections; (3) its communications did not qualify as "express communications"; (4) the statutes at issue were unconstitutionally vague; and (5) the statutes violated the First Amendment.

The superior court affirmed the Commission's order.  The court rejected APF's argument that the Commission's findings were not supported by record evidence.[32]  In addressing APF's statutory construction argument, the superior court applied the reasonable basis test for an agency's interpretation of statutes involving fundamental policies within an agency's purview.  The court concluded that the Commission reasonably adapted the "express communication" standard to speech about ballot propositions and reasonably concluded that APF's activities satisfied this definition.  Acknowledging that the statutory definition of "express communication"

---

**31**      *See* 2 Alaska Administrative Code (AAC) 50.865(b) ("A civil penalty determined under 2 AAC 50.855 may be . . . waived entirely based on the following factors . . . (5) the civil penalty assessment is significantly out of proportion to the degree of harm to the public for not having the information.").

**32**      The record before the superior court did not include a copy of APF's video on ranked-choice voting.  We invited the parties to supplement the record with the video, and they provided the video in MP4 format.  Although the video is accurate, the MP4 format does not give the viewer the same experience as watching the embedded video on APF's webpage.  We archived the webpage, but due to technology limitations, the video does not operate correctly on the archived page.  In the future, we urge parties to introduce exhibits of internet materials into the record or to archive these materials to ensure meaningful appellate review.

requires "limited reference to outside events,"[33] the court ruled that the Commission "reasonably concluded that APF's activities amounted to an express communication that was an exhortation to vote against [the Initiative]."

The superior court then rejected APF's vagueness argument. APF had argued that the statute's definition of "communication" in the statute — covering media that "directly or indirectly identif[ies] a candidate or proposition"[34] — was unconstitutionally vague because it does not give speakers sufficient notice of when their speech will "indirectly touch[] on a proposition." Citing the Ninth Circuit's decision in *Alaska Right to Life Committee v. Miles*,[35] the superior court reasoned that requiring disclosure for communications that "indirectly reference" a ballot measure was not unconstitutionally vague. It also concluded that there was no constitutional problem in applying this standard to APF because its publications made "unambiguous reference" to the Initiative.

The court examined APF's First Amendment arguments under an exacting scrutiny framework.[36] It rejected APF's argument that Alaska's "first-dollar" registration and reporting requirements were unconstitutional.[37] And it rejected APF's argument that the reporting and disclosure laws were not narrowly tailored.

---

[33] Former AS 15.13.400(7) (2020).

[34] *Id.* (defining "express communication" with reference to definition of "communication"); AS 15.13.400(3) (defining "communication" to be limited to media that "directly or indirectly identif[ies] a candidate or proposition").

[35] 441 F.3d 773, 780-86 (9th Cir. 2006).

[36] Under exacting scrutiny, courts will uphold a challenged law that is "narrowly tailored to the interest it promotes, even if it is not the least restrictive means of achieving that end." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609-10 (2021).

[37] In this context, the term "first-dollar" means that the statutory requirements apply to election-related spending no matter how small the amount spent.

APF appeals.

## III. STANDARD OF REVIEW

"When the superior court is acting as an intermediate court of appeal in an administrative matter, we independently review the merits of the agency or administrative board's decision."[38] Different standards apply depending on the subject of review.[39]

"We apply the reasonable basis standard, under which we give deference to the agency's interpretation so long as it is reasonable, when the interpretation at issue implicates agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions."[40]

By contrast, we use our independent judgment to interpret a statute when "the agency's specialized knowledge and experience would not be particularly probative on the meaning of the statute."[41]

"We apply our independent judgment to questions of constitutional law and review de novo the construction of the . . . federal Constitution[]."[42]

## IV. DISCUSSION

---

[38] *Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 298 (Alaska 2014) (quoting *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 630 (Alaska 2011)).

[39] *Id.* at 298-99; *see also, e.g.*, *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992) (recognizing four principal standards of review of administrative decisions).

[40] *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011).

[41] *Id.* (quoting *Matanuska-Susitna Borough v. Hammond*, 726 P.2d 166, 175 (Alaska 1986)).

[42] *Dunleavy v. Alaska Legis. Council*, 498 P.3d 608, 612 (Alaska 2021) (quoting *Alaskans for a Common Language, Inc. v. Kritz*, 170 P.3d 183, 189 (Alaska 2007)).

APF argues that the Commission's ruling that it violated Alaska's reporting, registration, and disclosure requirements for election-related spending must be reversed for three basic reasons.

First, it argues that the Commission erred in applying its governing statutes. It was error, APF contends, to adopt the "express communication" standard, which is defined in terms of candidate elections, for reportable expenditures involving ballot initiatives. It was also error, APF argues, to conclude that its speech qualified as expenditures that had to be reported and communications that required a "paid for by" disclosure.

Second, APF asserts that these standards are so vague that they do not give fair notice of what the law requires, violating the right to due process.

Third, APF argues that Alaska's reporting, registration, and disclosure requirements violate the First Amendment. APF maintains that the laws are not narrowly tailored in light of the burden they impose on election-related speech.

## A. We Uphold The Commission's Ruling That APF's Communications Triggered Reporting, Registration, And Disclosure Requirements.

### 1. It was not error to use the "express communication" standard when applying statutory reporting requirements.

Alaska law requires reporting of expenditures made for the purpose of influencing the outcome of a candidate election or a ballot proposition.[43] The legislature defined "expenditures" in a way that narrows the term when applied to speech related to candidate elections.[44]

This narrowing reflects federal court decisions interpreting similarly worded federal campaign finance laws to avoid unconstitutional vagueness and overbreadth. In *Buckley v. Valeo* the United States Supreme Court held that the Federal

---

[43]     AS 15.13.040(d); AS 15.13.135(a); AS 15.13.140(b).

[44]     Former AS 15.13.400(6)(C) (2020).

Election Campaign Act (FECA), which required disclosure of spending "for the purpose of . . . influencing" an election, had to be narrowly construed to avoid unconstitutional vagueness.[45] The Court construed the statute to cover only "funds used for communications that expressly advocate the election or defeat of a clearly identified candidate."[46] After Congress amended FECA accordingly, the Ninth Circuit, in *Federal Election Commission v. Furgatch*, interpreted this standard to mean speech that, "when read as a whole, and with limited reference to external events, [is] susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate."[47]

Alaska's legislature later enshrined the *Furgatch* standard in Alaska law.[48] Reportable expenditures are defined to include "express communications,"[49] which the legislature further defined using the language from *Furgatch* quoted above.[50] This language refers specifically to candidate elections and does not mention elections involving ballot propositions.[51]

The Commission decided to adopt a similar narrowing standard to determine when speech related to ballot propositions qualifies as an "expenditure" that

---

[45]     424 U.S. 1, 76-82 (1976).

[46]     *Id.* at 80 (footnote omitted).

[47]     807 F.2d 857, 864 (9th Cir. 1987).

[48]     Ch. 108, § 18, SLA 2003; Minutes, S. Fin. Comm. Hearing on S.B. 119, 23rd Leg., 1st Sess. (May 14, 2003) (testimony of Brook Miles, Executive Director, Alaska Public Offices Commission); Letter from Att'y Gen. Gregg D. Renkes to Gov. Frank H. Murkowski, 2003 WL 22701382 at *4 (June 5, 2003) (explaining that law replaced previous definition of "express communication," which required "explicit words of advocacy," with standard adopted by Ninth Circuit in *Furgatch*).

[49]     Former AS 15.13.400(6) (2020).

[50]     *Compare* former AS 15.13.400(7) (2020), *with Furgatch*, 807 F.2d at 864.

[51]     *See* former AS 15.13.400(5), (6)(C), (7), (12) (2020).

must be reported.[52]  While recognizing that the statutory definition of "express communication" refers only to candidate elections, the Commission determined that the definition "offer[ed] a useful framework" for regulating ballot-related speech consistently with federal law.  Accordingly, the Commission reasoned that speech related to a ballot proposition qualifies as an "expenditure" that must be reported if the speech, " 'when read as a whole and with limited reference to outside events, is susceptible of no other reasonable interpretation but as an exhortation to vote for or against' a ballot measure."

APF argues that the Commission erred in doing so.[53]  Its arguments on this point are in tension with each other.  It argues that the Commission erred by disregarding the statutory language, which defines "express communication" only in terms of candidate speech.  Yet APF also argues that the First Amendment requires the term "expenditure" to be construed narrowly as applied to speech about ballot propositions.  We do not find this position persuasive.

First, it is important to note that the Commission's approach does not *expand* the range of speech subject to regulation.  Rather, it limits the type of speech about a ballot proposition that can count as an "expenditure" that must be reported.  "Expenditure" means "a purchase or a transfer of money or anything of value . . . incurred or made for the purpose of . . . influencing the outcome of a ballot

---

[52]  The Commission appears to have first done so in an advisory opinion published in 2008. *See Renewable Res. Coal.*, *supra* note 30, at 11, (citing *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995); *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088 (9th Cir. 2003); *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449 (2007)).

[53]  The statutory definition of express communication incorporates AS 15.13.400(3)'s definition of communication, which requires "an announcement or advertisement disseminated through print or broadcast media," among other requirements. *See* former AS 15.13.400(7) (2020).  APF does not argue that any of its speech at issue fails to meet the communication definition because the speech was not "disseminated."

proposition or question."[54]   When the legislature narrowed the reach of the term "expenditure" by further defining it to include "express communications" and "electioneering communications" but not "issues communications," those limits applied only to speech about candidates.[55]   So the statutory definition of expenditure, on its face, sweeps more broadly for ballot proposition speech than for candidate speech.  The Commission's use of the "express communication" standard narrows the gap, exempting some speech about ballot propositions from regulation.

Second, we do not view the Commission's use of the "express communication" standard to regulate spending on ballot measures as a usurpation of the legislative role, as APF suggests.  Rather, it is an attempt to apply the agency's governing statutes within constitutional bounds, consistently with the principles of *Buckley* and subsequent federal court decisions.[56]   The Commission did not err by limiting its enforcement of Alaska's campaign finance statutes in this way.

---

[54]   Former AS 15.13.400(6)(A)(iv) (2020).

[55]   *See* former AS 15.13.400(6)(C) (2020) (providing that expenditure "*includes* an express communication and an electioneering communication, but does not include an issues communication" (emphasis added)); former AS 15.13.400(12) (2020) (defining "issues communication" as a communication that "directly or indirectly identifies a candidate" but "does not support or oppose a candidate for election to public office").

[56]   *Cf. Anderson v. Spear*, 356 F.3d 651, 664-65 (6th Cir. 2004) ("[W]hile the *McConnell* Court disavowed the theory that 'the First Amendment erects a rigid barrier between express advocacy and so-called issue advocacy,' it nonetheless left intact the ability of courts to make distinctions between express advocacy and issue advocacy, where such distinctions are necessary to cure vagueness and overbreadth in statutes which regulate more speech than that for which the legislature has established a significant governmental interest." (quoting *McConnell v. FEC*, 540 U.S. 93, 193 (2003))); *Yamada v. Snipes*, 786 F.3d 1182, 1188 (9th Cir. 2015) (holding that when evaluating vagueness challenge to campaign finance statute based on *Buckley*, court "must consider 'any limiting construction that a state court or enforcement agency has proffered' " (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989))).

**2.    It was not error to conclude that APF's speech triggered statutory reporting, registration, and disclosure requirements.**

We must next determine whether the Commission erred by concluding that APF's speech qualified as "communications" that had to contain a "paid for by" disclosure and as "express communications" that had to be reported. We first consider how much deference to give the Commission's decision. Then we examine APF's speech.

**a.    Standard of review**

The superior court applied the deferential reasonable basis standard to review the Commission's rulings. This is the standard that normally applies to an agency's application of a legal standard to a given set of facts when the issue involves the agency's expertise.[57]

But a deferential standard does not make sense in this particular case. That is because the "express communication" standard the Commission adopted is not susceptible to deferential review. According to the Commission, ballot speech qualifies as an express communication if, "when read as a whole and with limited reference to outside events," it "is susceptible of no other reasonable interpretation but as an exhortation to vote for or against" a specific ballot proposition.[58] The standard does not permit reasonable disagreement. We cannot say that the Commission had a reasonable basis to conclude that the speech is "susceptible of no other reasonable interpretation" than an exhortation to vote against a ballot proposition if we believe the speech *is*

---

[57]    *Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 299 (Alaska 2014).

[58]    Former AS 15.13.400(7) (2020); *see Renewable Res. Coal.*, *supra* note 30, at 11-12; *Bags for Change*, *supra* note 30, at 3-4 (applying the express communication framework in the ballot proposition context).

susceptible to a different interpretation.[59] To apply this standard, we must use our independent judgment.[60]

### b. Application to APF's communications

We now determine whether APF's speech qualified as "communications" that had to contain a disclosure and "express communications" that had to be reported. As noted above, a "communication" means an "announcement or advertisement" that "directly or indirectly identif[ies]" a ballot proposition.[61] An "express communication," as applied by the Commission to speech about ballot initiatives, means a "communication that, when read as a whole and with limited reference to outside events, is susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific"[62] ballot initiative. The latter term includes the former, so we analyze the terms together when considering their application to APF's speech.

Because the "express communications" standard is derived from the Ninth Circuit's decision in *Federal Election Commission v. Furgatch*,[63] which followed the

---

[59]     *See FEC v. Furgatch*, 807 F.2d 857, 864 (9th Cir. 1987) ("Speech cannot be 'express advocacy . . .' when reasonable minds could differ as to whether it encourages a vote for or against a candidate or encourages the reader to take some other kind of action.").

[60]     *See Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011) ("We apply the independent judgment standard, under which 'the court makes its own interpretation of the statute at issue, . . . where the agency's specialized knowledge and experience would not be particularly probative on the meaning of the statute.' " (alteration in original) (quoting *Matanuska-Susitna Borough v. Hammond*, 726 P.2d 166, 175 (Alaska 1986))).

[61]     AS 15.13.400(3).

[62]     Former AS 15.13.400(7) (2020).

[63]     807 F.2d 857; *see* Minutes, S. Fin. Comm. Hearing on S.B. 119, 23d Leg., 1st Sess. (May 14, 2003) (testimony of Brook Miles, Executive Director, Alaska Public Offices Commission) (referring to *Furgatch*).

U.S. Supreme Court's seminal campaign finance decision in *Buckley v. Valeo*,[64] we look to those cases for guidance on what the legislature intended.

In *Buckley* the Court considered the constitutionality of various provisions of FECA.[65] One of FECA's provisions required disclosure of election-related expenditures, defined as "the use of money or other valuable assets 'for the purpose of . . . influencing' the nomination or election of candidates for federal office."[66] The Court held that in light of FECA's significant criminal penalties, this definition had to be narrowly construed to avoid constitutional vagueness problems.[67] The Court was particularly concerned that the provision, without a narrowing construction, "could be interpreted to reach groups engaged purely in issue discussion," rather than only those advocating an electoral result.[68] It therefore held that FECA's disclosure requirement had to be narrowly interpreted to apply only to "funds used for communications that expressly advocate the election or defeat of a clearly identified candidate."[69] Congress amended FECA accordingly.[70]

In *Furgatch* the Ninth Circuit considered the newly revised provision of FECA and expanded upon the "express advocacy" test the Supreme Court had

---

[64]     424 U.S. 1 (1976).

[65]     *Id.*

[66]     *Id.* at 77 (alteration in original) (discussing 2 U.S.C. § 434(e) (1974) and quoting 2 U.S.C § 431(e), (f) (1974)).

[67]     *Id.* at 76-82.

[68]     *Id.* at 79.

[69]     *Id.* at 80 (footnote omitted).

[70]     *FEC v. Furgatch*, 807 F.2d 857, 859-60 (9th Cir. 1987) (discussing 2 U.S.C. § 431(17) (1980)).

articulated in *Buckley*.[71]   In *Buckley* the Court had described express advocacy as "communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' [and] 'reject.' "[72]   The Ninth Circuit reasoned that "express advocacy" is "not strictly limited to communications using certain key phrases" and noted that the list of "magic words" identified in *Buckley* "does not exhaust the capacity of the English language to expressly advocate the election or defeat of a candidate."[73]   It therefore concluded that speech should be considered express advocacy if, "when read as a whole, and with limited reference to external events, [it is] susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate."[74]

This analysis, according to the Ninth Circuit, permits limited consideration of the speech's context:  "A consideration of the context in which speech is uttered may clarify ideas that are not perfectly articulated, or supply necessary premises that are unexpressed but widely understood by readers or viewers."[75]   Yet the court cautioned that "context cannot supply a meaning that is incompatible with, or simply unrelated to, the clear import of the words."[76]

Attempting to distill a standard from those principles, the Ninth Circuit held that express advocacy has three elements.  First, the speech must be "unambiguous, suggestive of only one plausible meaning."[77]   Second, the speech must contain "a clear

---

[71]   *Id.* at 864; *see also Buckley*, 424 U.S. at 44 (holding limitations on expenditures could only be applied to "communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office").

[72]   *Buckley*, 424 U.S. at 44 n.52.

[73]   *Furgatch*, 807 F.2d at 862-63.

[74]   *Id.* at 864.

[75]   *Id.* at 863-64.

[76]   *Id.* at 864.

[77]   *Id.*

plea for action" and not be "merely informative."[78]  Third, it must be "clear what action is advocated"; speech cannot be express advocacy "when reasonable minds could differ as to whether it encourages a vote for or against a candidate or encourages the reader to take some other kind of action."[79]  Because our legislature invoked the *Furgatch* decision when enacting Alaska's definition of "express communications," we interpret that standard consistently with the decision's analysis.

APF argues that the Commission misapplied the express communication standard because it relied too much on context.  Specifically, APF challenges the Commission's reliance on two contextual factors:  (1) the timing of APF's publications relative to the election on the Initiative and (2) the fact that APF had not published statements about ranked-choice voting prior to 2020.  Although we need not defer to the Commission's decision and instead apply our independent judgment, we must decide whether these factors are proper to consider when applying the "express communication" standard directly to APF's communications.

Considering the timing of speech relative to an upcoming election is permissible.  The presence of an upcoming election is relevant to determining whether speech should be interpreted as an appeal to vote for or against a candidate or proposition.  In *Furgatch*, the Ninth Circuit considered whether a newspaper ad placed within a week of the presidential election qualified as "express advocacy" that had to be reported under FECA.[80]  The ad began with the words, "DON'T LET HIM DO IT," then described actions the president had done or would do, then concluded again: "DON'T LET HIM DO IT."[81]  The court reasoned that "[t]iming the appearance of the advertisement less than a week before the election left no doubt of the action

---

[78]     *Id.*

[79]     *Id.*

[80]     *Id.* at 865.

[81]     *Id.* at 858.

proposed."[82]  The advertisement at issue in *Furgatch* never explicitly mentioned the upcoming presidential election,[83] but the Ninth Circuit concluded that "[r]easonable minds could not dispute that Furgatch's advertisement urged readers to vote against Jimmy Carter" because "[t]his was the only action open to those who would not 'let him do it.' "[84]  An upcoming election is the kind of information that most reasonable listeners will be aware of, and that knowledge will shape their understanding of the message.

The same cannot always be said for the speaker's history of speech on a topic.[85]  The average reader or listener may not know whether the speaker has spoken on the subject before.  If the reader is not aware of the prior speech, that speech cannot have an effect on how the current message is interpreted.  Unless the prior speech is referenced by or displayed alongside the new speech (as on some social media platforms), it is external to the new speech.  Yet the "express communication" standard requires the speech to be evaluated with "limited reference to outside events."[86]

In this case the record is not conclusive as to whether APF's publications would have been read or seen together, so that one communication would shape an

---

[82]    *Id.* at 865.

[83]    *See id.* at 858, 865.

[84]    *Id.* at 865.

[85]    The Commission and Yes on 2 present scant legal authority or justification for relying on a speaker's history of speech to assess the meaning of an individual message.  The Ninth Circuit's decision in *Human Life of Washington Inc. v. Brumsickle* did not directly address this question, but its analysis suggests that the speaker's prior speech is not relevant.  *See* 624 F.3d 990, 1019 (9th Cir. 2010).  The court reasoned that a group "may avoid disclosure requirements any time that the issue about which it is speaking is not the subject of a ballot initiative or other public vote," but once the issue becomes the subject of an initiative, its advocacy on the issue must be reported.  *Id.* This reasoning indicates that a group's prior advocacy about an issue does not insulate its future advocacy from reporting requirements when the issue appears on the ballot.

[86]    Former AS 15.13.400(7) (2020).

objective reader's interpretation of the others.[87]  Without a clearer indication that the materials would likely be viewed together, we cannot say that the Commission was correct to consider them together when interpreting them.  We do not rule out the possibility that prior speech may be a permissible contextual factor in some cases.  But we decline to consider it here.

With these points in mind, we proceed to apply the statutory provisions to APF's speech.

### i.     July 24, 2020 press release

We first consider APF's July 24 press release announcing the launch of "the national education campaign Protect My Ballot."[88]  The release states that the campaign is "led by Alaska Policy Forum" and "details the harmful consequences of an electoral scheme known as Ranked Choice Voting (RCV)."  According to the press release, the campaign would "highlight[] bipartisan opposition to RCV."  The release goes on to describe how ranked-choice voting works and describes perceived negative consequences of this system.  The release concludes with four statements from representatives of Protect My Ballot's members.  The first quote is from Alaska Policy Forum's executive director:

> As Alaskans take to the polls in November, history should
> provide a warning for what Ranked Choice Voting would

---

[87]     The October 12 blog post ("Ranked-Choice Voting Disenfranchises Voters") includes a link to the YouTube video entitled "Ranked Choice Voting, Explained," which APF published on its YouTube page on July 31, 2020.  But to access the video, readers would have had to click the link to the other web page, and then click the video to play it.

[88]     In its decision, the Commission also described a newspaper opinion piece republished on APF's website in February 2020.  But it did not conclude that the republished opinion piece triggered reporting or disclosure requirements.  Instead it concluded that APF's announcements "at least as of its July press release were election-related expenditures and communications requiring compliance with AS 15.13."  No party has challenged the Commission's ruling that the opinion piece was not subject to regulation.  Therefore, we do not address this article in our analysis.

lead to. Not only can Ranked Choice Voting cause votes to be discarded, research shows it also decreases voter turnout. We need to encourage Americans of all backgrounds to visit the polls, not give them another reason to avoid casting a ballot.

The release also quotes a representative of a Minnesota-based group stating: "Public participation in elections is vital for a democracy to work. Discouraging and complicating the system threatens the people's voice. That's why a bipartisan coalition of citizens and legislators wants to ban ranked choice voting in Minnesota." The release ends with a statement from a Maine-based member of Protect My Ballot warning: "Voters should be skeptical when they hear from special interest groups trying to change the way we exercise our sacred right to vote."

APF first argues that this press release does not qualify as a "communication" requiring a "paid for by" disclosure because it does not "indirectly identify" the Initiative.[89] Although the press release does not identify the Initiative by name, the indirect identification of the Initiative is unambiguous. Comparison to a Ninth Circuit decision involving a Washington ballot initiative is instructive.

In *Human Life of Washington Inc. v. Brumsickle*, the Ninth Circuit considered a Washington campaign finance law using a standard similar to Alaska's "directly or indirectly identify" standard.[90] Concerned about potential enforcement of this law, an advocacy group challenged the law's application to advertisements it wished to publish in advance of the vote on a ballot initiative proposing to allow physician-assisted suicide.[91] For example, one proposed radio ad stated that "[a]ssisted suicide is back in the news" and went on to summarize results of a study about the

---

[89]    AS 15.13.400(3).

[90]    *See Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1014 (9th Cir. 2010) (citing Wash. Rev. Code § 42.17.020(38)).

[91]    *Id.* at 995-96.

practice in Oregon; another proposed ad warned that assisted suicide "turns doctors into killers."[92]  The group argued that "the government may not impose disclosure requirements on advertisements that avoid references to particular ballot initiatives, and instead speak only about the issues involved in pending ballot initiatives."[93]  The Ninth Circuit was unpersuaded by that argument.[94]  It observed that although the communications "do not mention [the ballot initiative] by name," they "explicitly state that physician-assisted suicide has reentered the realm of public debate and that the situation demands action."[95]  The court reasoned that the "detailed language and unique timing" of the communications rendered them "susceptible of no reasonable interpretation other than as an urgent appeal to vote down the measure."[96]  The court reached this conclusion in rejecting a constitutional challenge to the statute, rather than in interpreting the statutory standard.[97]  But its logic is persuasive here.

The references to the Initiative in APF's July 24 press release are at least as clear as the ads in *Human Life of Washington*.  The press release's detailed discussion of ranked-choice voting, its reference to "voters" and "Alaskans tak[ing] to the polls in November," and its timing — less than four months before the election — "indirectly identify" the Initiative and are susceptible to no interpretation other than an appeal to vote it down.  The fact that the message includes statements from people in other states criticizing and opposing ranked-choice voting does not undermine the conclusion that this press release, when referencing an upcoming Alaska election, makes clear reference to the Initiative.

---

[92]    *Id.* at 996 (alteration in original).

[93]    *Id.* at 1014.

[94]    *Id.* at 1015-16.

[95]    *Id.* at 1015.

[96]    *Id.* at 1015-16.

[97]    *Id.* at 1014-16.

APF's second argument is that its speech is not an "express communication" because it is "[c]lassic issue advocacy, as opposed to express advocacy." It likens its speech to the "genuine issue ad[s]" described in *Federal Election Commission v. Wisconsin Right To Life, Inc.*[98] In that case the Court considered the constitutionality of a federal law that prohibited corporations from using general treasury funds to pay for certain kinds of radio advertisements.[99] The ads described U.S. senators "using the filibuster delay tactic to block federal judicial nominees from a simple 'yes' or 'no' vote"; they urged voters to "[c]ontact Senators Feingold and Kohl and tell them to oppose the filibuster."[100] The Court, in a split opinion, ruled that federal law was unconstitutional as applied to the ads.[101] The principal opinion reasoned that prohibition on corporations paying for political advertisements could be upheld if the ads amounted to express advocacy.[102] But it concluded that the ads were not express advocacy because they "[did] not mention an

---

[98]     551 U.S. 449, 470 (2007) (Roberts, C.J.).

[99]     *Id.* at 464.

[100]    *Id.* at 458-59.

[101]    *Id.* at 481.

[102]    *Id.* at 465 (Roberts, C.J.) (citing *McConnell v. FEC*, 540 U.S. 93, 206 (2003)).  The principal opinion was joined by one other justice who also separately concurred. *Id.* at 482 (Alito, J., concurring).  Three justices concurred in part and in the judgment but rejected the principal opinion's reasoning; the concurrence would have overruled *McConnell* and established a "magic words" standard for constitutionally permissible limitation of corporate speech. *Id.* at 496, 500-04 (Scalia, J., concurring in judgment).  Four justices dissented, contending that the principal opinion had adopted an overly broad test for "issue" communications constitutionally exempt from campaign finance restrictions. *Id.* at 526-27 (Souter, J., dissenting).  "In cases with no majority, 'the position taken by those Members who concurred in the judgments on the narrowest grounds' controls." *State v. N. Pac. Fishing, Inc.*, 485 P.3d 1040, 1055 n.107 (Alaska 2021) (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)).  The narrowest opinion supporting the judgment in *Wisconsin Right To Life* is the principal opinion.

election, candidacy, political party, or challenger" and did not "take a position on a candidate's character, qualifications, or fitness for office."[103]  Instead the ads met the criteria for an "issues" communication:  The ads "focus[ed] on a legislative issue, [took] a position on the issue, exhort[ed] the public to adopt that position, and urge[d] the public to contact public officials with respect to the matter."[104]

We note as a threshold matter that *Wisconsin Right to Life* is not squarely on point.  In that case the federal statute under review *barred* express advocacy by certain entities.[105]  The justices analyzed this prohibition under the First Amendment, and a majority held that the First Amendment did not allow Congress to prohibit such speech.[106]  But the Alaska law at issue here does not prohibit speech; it requires reporting and disclosure of certain speech.  And the Supreme Court has rejected the argument that statutory reporting and disclosure requirements must be limited to speech that is express advocacy because "disclosure is a less restrictive alternative to more comprehensive regulations of speech."[107]  Therefore, we are skeptical that the "express advocacy" line described in *Wisconsin Right to Life*'s principal opinion should delimit the definition of "express communication" in Alaska's statutes.

In any event, APF's July 24 press release is not at all like the "issues" communications in *Wisconsin Right to Life*.  The *Wisconsin Right To Life* ads could plausibly be interpreted as urging listeners to do something other than vote against the senator standing for election.  The ads expressly urged listeners to take a different kind of action:  to call their senators and urge them to change their minds on the filibuster.[108]

---

103    *Wis. Right to Life, Inc.*, 551 U.S. at 470 (Roberts, C.J.).

104    *Id.*

105    *Id.* at 455 (citing 2 U.S.C. § 441b(b)(2) (2000 ed., Supp. IV)).

106    *Id.* at 457; *id.* at 483 (Scalia, J., concurring in judgment).

107    *Citizens United v. FEC*, 558 U.S. 310, 369 (2010).

108    *Wis. Right to Life, Inc.*, 551 U.S. at 458-59.

But APF's press release suggested no such alternative action. A ballot proposition cannot be persuaded to change its mind. And the press release expressly mentioned the upcoming election. The press release's reference to "Alaskans tak[ing] to the polls" made clear how ranked-choice voting should be opposed: by voting against the Initiative. It is "clear what action is advocated."[109]

APF maintains that the July press release cannot be an "express communication" because it is instead an issues communication — it "isolates a single issue, takes a position on it, and exhorts the public to adopt the speaker's view on that issue." But APF fails to acknowledge that, in the context of ballot initiatives, referencing an upcoming election and attempting to persuade the public to oppose a discrete issue on the ballot at that election amounts to advocating an electoral result. As recognized by the Ninth Circuit in *Human Life of Washington*, "express and issue advocacy are arguably one and the same" when it comes to ballot initiatives.[110]

Therefore, the only reasonable way to interpret the July 24 press release, published by APF a few months before the election, is as an exhortation to vote against the Initiative. The indirect reference to the Initiative is unmistakable from the references to "[v]oters" and "Alaskans tak[ing] to the polls in November." Though the call to action is not as explicit as *Furgatch*'s "Don't let him do it,"[111] the plea to vote against the Initiative is clear. The release approvingly emphasizes the "bipartisan opposition to RCV" and explains why speakers from other states "want[] to ban ranked choice voting." And it offers a "warning" to "Alaskans tak[ing] to the polls in November" about what ranked-choice voting would lead to: discarding votes and decreasing turnout. It then offers a prescription about what should be done: "We need to encourage Americans of all backgrounds to visit the polls, not give them another

---

[109]    *FEC v. Furgatch*, 807 F.2d 857, 864 (9th Cir. 1987).

[110]    624 F.3d 990, 1018 (9th Cir. 2010).

[111]    807 F.2d at 858.

reason to avoid casting a ballot." Given the reference to the upcoming election, the warning that ranked-choice voting will decrease turnout, and the urge to ensure the opposite result, this is a "clear plea to action":[112] Readers should vote against the ballot measure proposing ranked-choice voting. That is the only way "Alaskans tak[ing] to the polls in November" could avoid the threatened consequences.

We are unpersuaded by APF's argument that because the express communication standard requires the speech to be considered "as a whole," it is improper to highlight particular phrases or sentences. Highlighting particular sentences is an appropriate way to apply the express communication standard because particular sentences may have outsized impact on the overall meaning of a statement.[113] For example, in *Furgatch*, the sentence "don't let him do it" was key to the ad's meaning: It turned what otherwise might have been a criticism of the president's conduct into a call to action.[114] The Ninth Circuit rejected the idea that highlighting key phrases necessarily ignores a communication's broader context, emphasizing "that the whole consists of its parts in relation to each other."[115]

APF maintains that because ranked-choice voting was only one of three components of the Initiative, its publications criticizing ranked-choice voting do not amount to exhortations to vote against the Initiative as a whole. Again, we are not persuaded. The press release's statements urged an outcome: "We need to encourage Americans of all backgrounds to visit the polls, not give them another reason to avoid casting a ballot." In light of the release's assertion that ranked-choice voting would do

---

[112] *Id.* at 864.

[113] *See id.* at 863 ("Comprehension often requires inferences from the relation of one part of speech to another.").

[114] *Id.* at 864 ("The words we focus on are 'don't let him.' They are simple and direct. 'Don't let him' is a command. The words 'expressly advocate' action of some kind.").

[115] *Id.* at 863.

the opposite, the only way that Alaskans "tak[ing] to the polls in November" could accomplish that outcome was to vote against the Initiative.

For these reasons, the July 24 press release qualified as both a "communication" and an "express communication" subject to disclosure and reporting requirements.

### ii. July 31, 2020 ranked-choice voting video

On July 31, 2020, APF posted a video to its website and YouTube channel.[116] The video begins by describing how traditional voting works, then states: "Now, some wealthy interest groups are pushing for ranked-choice voting."[117] The video describes the various ways in which ranked-choice voting is harmful to voters' interests and directs viewers to visit Protect My Ballot's website to learn more.[118] The last frame of the video features animated hands holding up signs that read "PROTECT MY VOTE" and "SAY NO TO RANKED CHOICE VOTING."[119] When a cursor is moved over the video, it displays a header with APF's logo next to the title.[120] The video is displayed in the middle of the web page below the following caption: "Ranked choice voting (RCV) is an electoral scheme that adds more confusion to the voting system while threatening our democracy and failing to ensure every vote counts."[121] At the top of the web page is a banner with APF's name, logo, and vision statement: "an

---

[116] *Video: Ranked Choice Voting, Explained*, ALASKA POL'Y F. (July 31, 2020), https://alaskapolicyforum.org/2020/07/video-rcv-explained/ (archived at https://perma.cc/4PH3-Z9VW). We note that the staff report described the video as originally being posted from Protect My Ballot's YouTube page; the embedded link on APF's website connects to APF's own YouTube channel. *See id.*

[117] *Id.*

[118] *Id.*

[119] *Id.*

[120] *Id.*

[121] *Id.*

Alaska that continuously grows prosperity by maximizing individual opportunities and freedom."[122]

APF argues that this video cannot qualify as a "communication" because it does not directly or indirectly identify the Initiative. The video itself does not mention Alaska, nor does it mention the Initiative by name. But it is published on the website of the Alaska Policy Forum beneath a statement of the group's vision for Alaska. Displayed in this context, the reference to a "push[]" for ranked-choice voting by "wealthy interest groups" is an unambiguous reference to the upcoming ballot proposition, especially for Alaskans who are presumably the main audience for the message. The video urges viewers to "SAY NO TO RANKED CHOICE VOTING."[123] Unlike the ads in *Federal Election Commission v. Wisconsin Right To Life, Inc.*, which urged listeners to contact legislators, the APF video's call to action is not ambiguous.[124] In the context of an upcoming election in which ranked-choice voting is on the ballot, the video's reference to a "push" by "interest groups" for ranked-choice voting and its call to "SAY NO TO RANKED CHOICE VOTING" is a clear, albeit indirect, reference to voting against the Initiative.

In this way the video is similar to the advertisements that the Ninth Circuit in *Human Life of Washington Inc. v. Brumsickle* deemed susceptible of no reasonable interpretation other than as an urgent appeal to vote against Washington's assisted suicide initiative.[125] The ads did not expressly reference the initiative, but pointedly criticized assisted suicide.[126] For example, one of the proposed radio ads referenced the Hippocratic Oath, then stated that assisted suicide undermines the trust the oath

---

[122]   *Id.*

[123]   *Id.*

[124]   551 U.S. 449, 458-59, 470 (2007).

[125]   624 F.3d 990, 1015 (9th Cir. 2010).

[126]   *Id.* at 995-96.

promotes by "turn[ing] doctors into killers. That's dangerous."[127]  Compared to that ad, the ranked-choice voting video's reference to the ballot proposition and its call to action are clearer. APF's publication of the video cannot be reasonably interpreted as anything but an exhortation to vote against the Initiative.

### iii.  October 8, 2020 press release and report

APF issued a press release on October 8, 2020, just weeks before the election. The press release announced that APF had issued a report exposing "alarming ramifications to ranked-choice voting," such as "how the method of determining a winner results in discarded ballots, how RCV elections do not result in a majority winner, and how it can completely change the outcome of an election."  The release described the results of the report, which was hyperlinked at the end of the press release, as "disturbing."  Emphasized in larger, bold font in the middle of the page was a quote from APF's Vice President of Operations & Communications:

> A voting system that frequently results in the discarding of legally submitted ballots has no place in Alaska or anywhere else in the United States.  After researching candidates, going to the polls, and voting, no Alaskan should have to worry that their ballot won't be counted in the final tally.

This press release can be reasonably interpreted only as an exhortation to vote against the Initiative. It indirectly identifies the Initiative by describing ranked-choice voting as a "voting system that . . . has no place in Alaska" and urging that "no Alaskan should have to worry that their ballot won't be counted in the final tally." The call to action is less explicit than *Furgatch*'s "Don't let him do it."  But it is still unmistakable. To an objective listener, likely aware of the upcoming election, the statement that ranked-choice voting "has no place in Alaska" can only be understood

---

[127]  *Hum. Life of Wash. Inc. v. Brumsickle*, No. C08-0590, 2009 WL 62144, at *4-5 (W.D. Wash. Jan. 8, 2009), *aff'd*, 624 F.3d 990 (9th Cir. 2010).

as a plea to vote against the ballot measure that would bring ranked-choice voting to Alaska.[128]

### iv. October 12, 2020 article

The October 12 article, authored by an APF intern and titled "Ranked-Choice Voting Disenfranchises Voters," was published less than a month before the election. The article opens by stating: "A voting trend to uproot the electoral process is sweeping the country and has made it all the way to Alaska, ranked-choice voting (RCV)." As the title suggests, the piece describes the ways in which ranked-choice voting "threatens to complicate voting, ultimately disenfranchising voters and decreasing turnout." The piece contrasts ranked-choice voting with the traditional "one person, one vote" process, explains the contention that ranked-choice voting confuses voters and results in votes not being counted, and points to jurisdictions in which voters have enacted and then repealed ranked-choice voting. It concludes with the cautionary statement that "other cities and states should serve as an example of the complications that arise from implementing RCV. It is critical for our country that elections maintain their integrity, and disenfranchising voters through RCV accomplishes the opposite."

This article is susceptible of only one interpretation: an appeal to vote "no" on the Initiative. First, the article's description of "[a] voting trend to uproot the electoral process" — which it identifies as ranked-choice voting — that "has made it all the way to Alaska" indirectly but clearly identifies the Initiative. Second, the article's descriptions of the harmful consequences of ranked-choice voting make its opposition to the Initiative clear. In light of the article's release mere weeks before the election, the admonition that jurisdictions that have adopted and then repealed ranked-choice voting "should serve as an example" to Alaskans can only be read as a declaration "that the situation demands action."[129] So too with the closing pitch that

---

[128] *See FEC v. Furgatch*, 807 F.2d 857, 865 (9th Cir. 1987).

[129] *Hum. Life of Wash. Inc.*, 624 F.3d at 1015.

"[i]t is critical for our country that elections maintain their integrity" and that "[a]ll Alaskans deserve to have their votes counted," but ranked-choice voting "accomplishes the opposite." The only reasonable interpretation of this piece is that it exhorts readers to vote against the Initiative. Therefore, it was both a "communication" requiring a "paid for by" disclosure and an "express communication" that had to be reported.

**B.** **APF Fails To Show That Alaska's Reporting And Disclosure Statutes Are Unconstitutionally Vague As Applied To Ballot-Related Speech.**

A law is void for vagueness if it fails to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited" and to "provide explicit standards for those who apply them."[130] "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."[131] Even so, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity"[132] because "we can never expect mathematical certainty from our language."[133]

APF makes both facial and as-applied vagueness challenges to Alaska's campaign finance regime.

**1.** **Facial challenge**

APF challenges AS 15.13's framework as facially vague. It argues that the standards enshrined in statute, when applied to ballot propositions, do not provide sufficient clarity to those who wish to speak publicly about policy issues when those policies are on the ballot. It raises several concerns: the lack of standards for when

---

[130] *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

[131] *FCC. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012); *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) ("If . . . the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.").

[132] *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

[133] *Grayned*, 408 U.S. at 110.

advocacy on a particular issue "indirectly identifies" a ballot proposition; the Commission's consideration of the speech's neutrality; the lack of clear time limits for when issue speech can be construed as identifying a ballot proposition; and the Commission's reliance on the speaker's history of speech.

We have already explained that it will often be improper to consider a speaker's history of speech when applying the "express communication" standard and have declined to consider it here. As for the other arguments, we address each in turn.

### a. Whether speech "directly or indirectly identifies" a ballot proposition

As explained above, speech qualifies as a "communication" that must contain a "paid for by" disclosure if it is an advertisement or announcement disseminated through media that "directly or indirectly identifies" a ballot proposition.[134] APF argues that this standard — "directly or indirectly identifies" — is unconstitutionally vague. It appears to argue that it is not clear what it means to "indirectly identify" a ballot proposition, so a narrowing construction must be applied to this term to avoid the statute being void for vagueness. We agree for the reasons stated below. With this interpretation, we do not believe the definition of "communication" is void for vagueness.[135]

In defending against APF's vagueness argument, the Commission points out that the Ninth Circuit has already upheld the standard "directly or indirectly identify" against a facial vagueness challenge.[136] But this decision is not directly on

---

[134]  AS 15.13.090(a); AS 15.13.400(3) (2020). Speech by an individual or nongroup entity costing $500 or less is excluded from this definition and therefore is not required to contain a "paid for by" disclosure. AS 15.13.400(3).

[135]  *United States v. Lanier*, 520 U.S. 259, 266 (1997) ("[C]larity . . . may be supplied by judicial gloss on an otherwise uncertain statute.").

[136]  *See Alaska Right To Life Comm. v. Miles*, 441 F.3d 773, 782-83 (9th Cir. 2006) (holding definition of electioneering communications not unconstitutionally vague for requiring that communication directly or indirectly identifies candidate).

point because it arose in the context of candidate elections. APF asserts that it may be easier to determine whether speech indirectly identifies a candidate for office, who is a specific person, than to determine whether speech indirectly identifies a ballot proposition, which addresses a specific issue of public policy. According to APF, if speech is held to "indirectly identify" a proposition merely because the speech supports or opposes the issue that is the subject of an upcoming ballot proposition, then speakers will not know whether their speech qualifies as a regulated "communication."

APF's argument has merit. Even when an issue is soon to come before the voters on a ballot proposition, not all speech addressing the issue necessarily concerns the ballot proposition.

One of the Commission's past advisory opinions illustrates this dynamic.[137] At the time, two ballot propositions concerning regulations for large mines were set to come before the voters at the next election.[138] A nonprofit group requested an advisory opinion on whether it would be required to report ads it wished to run urging listeners to "[p]rotect clean water and wild Alaska salmon."[139] The Commission ruled that while the language might be interpreted as support for the propositions, that was not the only reasonable interpretation of the ads because there were "numerous different kinds of opposition activity" to the Pebble Mine, the apparent target of the ballot propositions.[140] In other words, because the speech could reasonably be understood to urge the listener to take some action to protect clean water and fish other than vote for the ballot propositions, it was not subject to regulation. We can envision similar instances when it may be unclear whether a speaker "indirectly identifies" a ballot proposition when an issue addressed by the speaker is on the ballot.

---

[137] *Renewable Res. Coal.*, *supra* note 30.

[138] *Id.* at 9.

[139] *Id.* at 1, 10.

[140] *Id.* at 11-12.

Consistent with *Buckley*, we must take care to ensure that speakers who wish to address policy matters not in connection with a ballot proposition are not forced to "hedge and trim"[141] to avoid their speech being misinterpreted as urging an electoral result.[142] Therefore, we hold that an indirect reference to a ballot proposition must be unambiguous in order for speech to qualify as a "communication" that must carry a "paid for by" disclosure. With such a construction, we do not believe the definition of "communication" that triggers statutory disclosures is unconstitutionally vague.

APF disagrees that its speech unambiguously identified the ballot proposition. But statements such as "Alaskans tak[ing] to the polls in November" and a "voting trend" that had "made it all the way to Alaska" were unambiguous references to the upcoming ballot proposition presenting ranked-choice voting. Because of the nature of ranked-choice voting — a change to the electoral system, which can be effectuated only through change to the law — the only reasonable way to interpret APF's speech opposing ranked-choice voting was as a reference to the upcoming ballot initiative proposing to enact ranked-choice voting.

### b. Lack of neutrality

APF also challenges the Commission's interpretation of the "express communication" standard — whether speech is "susceptible of no other reasonable interpretation but as an exhortation to vote for or against" a specific ballot initiative — on vagueness grounds. APF argues that the Commission's focus on whether APF's statements were "neutral" was improper and suggests that, to the extent the "express

---

[141] *Buckley v. Valeo*, 424 U.S. 1, 43 (1976) (quoting *Thomas v. Collins*, 323 U.S. 516, 535 (1945)).

[142] *Cf. Anderson v. Spear*, 356 F.3d 651, 664-65 (6th Cir. 2004) ("[T]he *McConnell* Court . . . left intact the ability of courts to make distinctions between express advocacy and issue advocacy, where such distinctions are necessary to cure vagueness and overbreadth in statutes which regulate more speech than that for which the legislature has established a significant governmental interest.").

communication" standard requires examining the speaker's statements for neutrality, it is unconstitutionally vague. Although the Commission's reference to neutrality may have been imprecise, applying the "express communication" standard to speech about ballot propositions necessarily entails interpreting the speaker's language, and the need to do so does not make this standard unconstitutionally vague.

The Commission's decision asserted that APF's publications were "not neutral" and went on to quote excerpts before concluding that the publications could only be interpreted as exhortations to vote against the proposition. But the Commission did not elaborate on what it meant by "neutral" or why it interpreted the publications that way. The Commission might have meant that ranked-choice voting was not presented "neutrally," a factor supporting its conclusion that the publications could be interpreted only as exhortations to vote against the Initiative. Alternatively, the Commission's statement that the publications were "not neutral" might have been a way of stating its conclusion: i.e. that the publications opposed the Initiative.

To the extent the Commission was referring to a slant in the way ranked-choice voting was discussed, we caution that slanted language is not necessarily an exhortation to vote a certain way. It can be difficult to determine whether discussion of an issue is truly "neutral." For instance, a pamphlet discussing the pros and cons of an issue may be viewed by some as neutral and by others as non-neutral depending on what facts are presented and how they are described. Pointing out the costs and benefits of a policy proposal does not necessarily amount to an appeal to vote for or against it.

But the "express communication" standard need not incorporate a "magic words" test to avoid being unconstitutionally vague. That is, we do not believe that the need to give the public fair notice of what speech is subject to regulation, and to give regulators a precise standard to apply, means that only speech containing words like "vote against" can be deemed a clear plea to vote against a ballot initiative. Rather, if the speech unambiguously identifies the ballot proposition (as required by our ruling above), it is permissible to consider statements of support for or opposition to the policy

**7801**

on the ballot to conclude that the speaker is urging a vote for or against the ballot proposition. Normative language can evoke a "clear plea for action"[143] — such as what people "need" to do when they "take to the polls" or the assertion that ranked-choice voting "has no place in Alaska." Concluding that such language can meet the express communication standard does not, in our view, make the law unconstitutionally vague.

The vagueness concerns identified in *Buckley*, on which APF relies, do not apply in the same way in the context of ballot propositions. An ad expressing opposition to an issue while referring to a particular candidate may be susceptible to different interpretations. Such was the case with the ads at issue in *Wisconsin Right to Life*, which urged listeners, on the eve of an election, to call their senators about the filibuster.[144] By contrast, an ad expressing opposition to a policy while referring to a ballot proposition about that policy does not have the same ambiguity.[145] Therefore, we reject APF's argument that the express communication standard, as applied to ballot propositions, is unconstitutionally vague.

### c. Timing

APF also criticizes the Commission's reliance on the timing of APF's speech relative to the placement of the issue on the ballot as "arbitrary" and providing "no guidance to the unwary as to when the relevant time period starts." But the time period during which speech can count as a reportable "expenditure" or a

---

[143] *FEC v. Furgatch*, 807 F.2d 857, 864 (9th Cir. 1987) ("[S]peech may only be termed 'advocacy' if it presents a clear plea for action, and thus speech that is merely informative is not covered . . . .").

[144] 551 U.S. 449, 459 (2007) (Roberts, C.J.).

[145] *See Nat'l Org. for Marriage, Inc. v. McKee*, 669 F.3d 34, 45 (1st Cir. 2012) (explaining that need for disclosure statutes to be narrowly construed to exempt issue advocacy so as to avoid vagueness does not apply with same force in context of ballot measure speech because for "state ballot question committees, . . . only issue advocacy is involved, and there is no vagueness" (quoting *Nat'l Org. for Marriage v. McKee*, 765 F. Supp. 2d 38, 53 n.86 (D. Me. 2011)) (internal quotation marks omitted)).

-40-                    **7801**

"communication" requiring a disclosure is established in statute. The terms "expenditure" and "communication" are both defined by reference to ballot propositions and applications to place a proposition on the ballot.[146] Speech about an issue may be subject to the statutory reporting and disclosure requirements only while the issue is the subject of an initiative that has been placed on the ballot at an upcoming election[147] or the subject of an application filed with the lieutenant governor as part of that process.[148] That period is not as straightforward or simple to determine as a specific number of days before the election. But it is defined precisely enough in statute to give those intending to make paid speech on a policy issue a reasonable opportunity to know whether they would be subject to regulation and to minimize the risk of arbitrary enforcement.[149] We also note that a person may request an advisory opinion from the

---

[146] *See* AS 15.13.400(3) (2020) (defining "communication" to exclude speech that does "not directly or indirectly identify a candidate or proposition, as that term is defined in AS 15.13.065(c)"); AS 15.13.065(c) (defining "proposition" to include issue placed on ballot and initiative proposal application filed with lieutenant governor); former AS 15.13.400(6)(A)(iv)-(v) (2020) (defining "expenditure" to include money spent for purpose of "influencing the outcome of a ballot proposition or question" or for "supporting or opposing an initiative proposal application filed with the lieutenant governor"). Active petitions and ballot measures can be found on the Alaska Division of Elections' website. *See Petitions and Ballot Measures*, ALASKA DIV. OF ELECTIONS, https://www.elections.alaska.gov/petitions-and-ballot-measures/ (archived at https://perma.cc/659L-NJSG) (last visited Oct. 1, 2025).

[147] AS 15.45.190 (directing lieutenant governor to place proposition on ballot of "first statewide general, special, special primary, or primary election that is held after . . . petition has been filed, . . . a legislative session has convened and adjourned; and . . . a period of 120 days has expired since the adjournment of the legislative session").

[148] AS 15.45.020 (providing for filing application for initiative with lieutenant governor); *see also* AS 15.45.030–.140 (describing process for filing of application for initiative and obtaining signatures to have proposition placed on ballot).

[149] "[A] plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010). APF made the four

---

Commission on whether planned messages would be subject to regulation.[150] Therefore, we do not believe the reporting and disclosure statutes are unconstitutionally vague.[151]

### 2.     As-applied challenge

APF argues that the Commission's "express communication" standard is unconstitutionally vague as applied to its publications because they addressed only one of the three major changes proposed by the Initiative.  Specifically, APF argues that the definition of communication is unconstitutionally vague as applied to its own publications because it "refers to the direct or indirect identification of a ballot initiative, not to the discussion of any 'key' issue" within a ballot initiative.[152]  It argues that "[n]othing about the topic of ranked-choice voting as an issue in 2020 would alert APF that opposition to ranked-choice voting necessarily meant opposition" to the Initiative.

---

communications at issue well after the Better Elections Initiative qualified for the ballot. Therefore, APF cannot complain of the vagueness of the timing as applied to others' speech, such as those who might speak on an issue before it qualifies for the ballot.

[150]     AS 15.13.374.

[151]     Because APF has challenged the timeframes for regulation on vagueness grounds only, rather than overbreadth, we do not address the latter issue.  "[I]mprecise laws can be attacked on their face under two different doctrines":  overbreadth and vagueness.  *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (plurality opinion).  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  But "[a] clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct."  *Id.* at 114 (citing *Zwickler v. Koota*, 389 U.S. 241, 249-50 (1967)).

[152]     *See* AS 15.13.400(3).  APF also argues in the facial challenge section of its brief that "APOC used no minimum standards to determine that [the Initiative]'s 'key issue' was ranked-choice voting."  Because this argument is about the constitutionality of the law in the factual context of APF's communications, rather than a challenge to the law on its face, we only address it here in the as-applied section.

We disagree. The July 24 press release, July 31 video, October 8 press release, and October 12 opinion piece all alluded to ranked-choice voting as a policy issue facing Alaskans. And all four pieces clearly urged opposition to ranked-choice voting in Alaska. The July 24 press release included statements by the APF executive director that "[a]s Alaskans take to the polls in November, history should provide a warning for what Ranked Choice Voting would lead to," that ranked-choice voting decreases voter turnout and results in discarded votes, and that "[w]e need to encourage Americans of all backgrounds to visit the polls, not give them another reason to avoid casting a ballot." The final frame of the July 31 video posted on APF's website urged viewers to "SAY NO TO RANKED CHOICE VOTING."[153] The remaining two publications, issued within a month of the election, also straightforwardly opposed the adoption of ranked-choice voting in Alaska. The October 8 press release stated that a voting system like ranked-choice voting "has no place in Alaska." And the October 12 opinion piece framed ranked-choice voting as "[a] voting trend to uproot the electoral process" which "is sweeping the country and has made it all the way to Alaska." In the context of an upcoming election with ranked-choice voting on the ballot, the publications' call to oppose ranked-choice voting by rejecting the Initiative is, while implicit, entirely clear.

This is particularly true because, at the time, Alaskans had only one route to oppose ranked-choice voting: casting their vote against it. Unlike the ads urging listeners to "protect clean water and wild Alaska salmon" in the advisory opinion

---

[153] *Video: Ranked Choice Voting, Explained*, ALASKA POL'Y F. (July 31, 2020), https://alaskapolicyforum.org/2020/07/video-rcv-explained/ (archived at https://perma.cc/4PH3-Z9VW).

discussed earlier,[154] there were not numerous different ways for Alaskans to oppose ranked-choice voting. Therefore, there is no ambiguity about the action urged.

The fact that the Initiative included other policy measures does not change that dynamic. The title of the ballot measure was "An Act Replacing the Political Party Primary with an Open Primary System and Ranked-Choice General Election, and Requiring Additional Campaign Finance Disclosures."[155] With the election just months away, it should have been clear to APF that by urging readers to oppose ranked-choice voting, it was urging them to vote against the Initiative. There was no other way for APF's listeners to "SAY NO TO RANKED CHOICE VOTING."

Therefore, application of Alaska's reporting and disclosure statutes to APF's speech was not unconstitutionally vague.

### C. APF's First Amendment Challenges Are Unavailing.

APF argues that Alaska's registration, reporting, and disclosure requirements violate the First Amendment. APF acknowledges that the government has a legitimate interest in ensuring that voters receive useful information. But it contends that Alaska's laws are not substantially related or narrowly tailored to that interest and therefore unnecessarily burden protected speech.

When reporting and disclosure laws are challenged on First Amendment grounds, we subject the laws to exacting scrutiny.[156] Exacting scrutiny requires "a substantial relation between the disclosure requirement and a sufficiently important

---

[154] *Cf. Renewable Res. Coal.*, *supra* note 30, at 9-12 (finding that advertisements to "protect clean water and wild Alaska salmon" were subject to reasonable interpretations other than exhortations to vote for two initiatives — both called The Alaska Clean Water Initiative — which proposed regulations for new large scale mining projects in Alaska).

[155] BALLOT MEASURE NO. 2 (2020), https://www.elections.alaska.gov/petitions/19AKBE/19AKBE%20-%20Ballot%20Language%20Summary.pdf (archived at https://perma.cc/L7DN-2MEK).

[156] *Citizens United v. FEC*, 558 U.S. 310, 366-67 (2010).

governmental interest."[157] And "the challenged requirement must be narrowly tailored to the interest it promotes, even if it is not the least restrictive means of achieving that end."[158]

Although APF acknowledges that courts have applied exacting scrutiny to disclosure requirements, it argues that requiring the speaker to describe who paid for the message amounts to compelled speech, which is subject to strict scrutiny. Under strict scrutiny a law is upheld only if is the least restrictive means of achieving a compelling state interest.[159] APF points out that in *National Institute of Family & Life Advocates v. Becerra*, the Supreme Court declined to decide whether strict or exacting scrutiny applied to statements that the State of California required crisis pregnancy centers to make about the availability of state-funded abortion services.[160]

We are not persuaded that strict scrutiny applies. The compelled speech in *National Institute of Family & Life Advocates* required the pregnancy centers to "alte[r] the content of [their] speech."[161] The "paid for by" disclosure does not alter the content of speech; it simply says who paid for it. "[R]egulations directed only at *disclosure* of political speech are subject to . . . 'exacting scrutiny.' "[162] We therefore review APF's challenge to both the reporting and disclosure requirements using exacting scrutiny.

---

[157]  *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 64, 66 (1976)) (internal quotation marks omitted).

[158]  *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609-10 (2021).

[159]  *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).

[160]  585 U.S. 755, 773-74 (2018).

[161]  *Id.* at 766 (alteration in original) (quoting *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 795 (1988)).

[162]  *Nat'l Ass'n for Gun Rts, v. Mangan*, 933 F.3d 1102, 1112 (9th Cir. 2019) (emphasis in original); *see also Citizens United*, 558 U.S. at 366-67 (applying exacting scrutiny to disclosures); *Buckley*, 424 U.S. at 64-66 (same).

Exacting scrutiny requires "a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest."[163]   And "the challenged requirement must be narrowly tailored to the interest it promotes, even if it is not the least restrictive means of achieving that end."[164]

The interest underlying Alaska's reporting and disclosure laws is strong enough to pass exacting scrutiny.  The Supreme Court has held that the government's interest in an informed electorate satisfies exacting scrutiny.[165]   We too have emphasized that an informed electorate is necessary to the "effective functioning of our democratic form of government" and that this rationale "applies with full force to ballot issues."[166]  Because ballot propositions are "often complex and difficult to understand," a "voter may wish to cast his ballot in accordance with his approval, or disapproval, of the sources of financial support."[167]  The Ninth Circuit has reasoned that "by revealing information about the contributors to and participants in public discourse and debate, disclosure laws help ensure that voters have the facts they need to evaluate the various messages competing for their attention."[168]

APF acknowledges the importance of this purpose but argues that the reporting and disclosure laws cannot withstand exacting scrutiny because they are not substantially related to it or narrowly tailored.

---

[163]   *Citizens United*, 558 U.S. at 366-67 (quoting *Buckley*, 424 U.S. at 64, 66).

[164]   *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609-10 (2021).

[165]   *Citizens United*, 558 U.S. at 367 (citing *Buckley*, 424 U.S. at 66).

[166]   *Messerli v. State*, 626 P.2d 81, 86-87 (Alaska 1980).

[167]   *Id.* at 87.

[168]   *Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1005 (9th Cir. 2010).

### 1. Applying the reporting and disclosure statutes to APF's speech has a substantial relation to the government's interest in an informed electorate.

APF argues that the statutes' requirements are "insufficiently tied" to the government's interest in an informed electorate because they are triggered, in some instances, no matter how little money is spent to produce the speech. APF argues that the public has little interest in knowing the identity of those funding speech that costs very little to produce.

As explained earlier, Alaska law requires that expenditures made for the purpose of influencing a ballot proposition be reported to the Commission, and such expenditures include certain kinds of speech.[169] Political groups and nonprofits (but not individuals) must also register before making such expenditures.[170] There is no general *de minimis* exception to these requirements. Expenditures by an individual "acting independently of any other person" on certain printed materials need not be reported if they total less than $500 annually.[171] But there is no low-dollar exemption for expenditures by non-individual speakers (such as nonprofits and political groups).

Similarly, a "paid for by" disclosure is required for all "announcement[s] or advertisement[s] disseminated through print or broadcast media," regardless of how much they cost to produce, except for those by "individual[s] or nongroup entit[ies]" that cost $500 or less.[172] This means that even low-cost communications by groups, for-profit entities, and labor unions must contain a disclosure.

---

[169] AS 15.13.040(d) (requiring full report of expenditures made); former AS 15.13.400(6) (2020) (defining expenditures).

[170] *See* AS 15.13.050(a).

[171] AS 15.13.040(h).

[172] AS 15.13.090 (disclosure requirement applicable to "communications"); AS 15.13.400(3) (defining "communication").

APF argues that low monetary thresholds for regulation are "suspect" and that the scrutiny "only intensifies as the threshold goes to zero." Accordingly, APF argues that Alaska's campaign finance regulations are unconstitutional as applied to its own communications and expenditures, which it suggests were negligible. To evaluate this claim, we first review the law on this issue and then turn to the facts of APF's case.

The Ninth Circuit has repeatedly addressed thresholds for campaign finance regulation. In *Smith v. Helzer* the court rejected a challenge to Alaska's reporting and disclosure requirements for individual donations greater than $2,000 per year when aggregated and made to organizations that make independent expenditures in candidate elections.[173] In upholding the reporting requirements, the Ninth Circuit explained that the line at which campaign contributions must be disclosed is " 'necessarily a judgmental decision, best left' to the discretion of the legislature, here the people of Alaska."[174] The court went on to emphasize that "[b]ecause '[t]he acceptable threshold for triggering reporting requirements need not be high,' [it has] routinely upheld reporting thresholds much lower than the $2,000-per-calendar-year one here," noting that it had upheld "reporting thresholds as low as $100."[175] And in *National Association for Gun Rights, Inc. v. Mangan*, the Ninth Circuit ruled that a Montana disclosure regime applicable to organizations spending more than $250 on a single electioneering communication was "within the range of constitutionally acceptable reporting thresholds."[176]

By contrast, in *Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*, the Ninth Circuit held that a church's in-kind expenditures made in support

---

[173]    95 F.4th 1207, 1212, 1217-18 (9th Cir. 2024).

[174]    *Id.* at 1218 (quoting *Buckley v. Valeo*, 424 U.S. 1, 83 (1976)).

[175]    *Id.* (second alteration in original) (quoting *Nat'l Ass'n for Gun Rts., Inc. v. Mangan*, 933 F.3d 1102, 1118 (9th Cir. 2019)).

[176]    933 F.3d at 1118.

of a petition to put a proposal on the ballot were *de minimis* and could not be constitutionally subject to Montana's (formerly) first-dollar disclosure law.[177] The church's pastor had allowed a member of the congregation to use the church's copy machine to make copies of the petition; allowed the member to place copies in the church's foyer; screened a film on the topic of the petition in connection with a regularly scheduled church service; circulated copies of the petition to those attending the service; and encouraged them to sign.[178] The Ninth Circuit concluded that "the value of public knowledge that the Church permitted a single likeminded person to use its copy machine on a single occasion . . . does not justify the burden imposed by Montana's disclosure requirements."[179]

Other cases to which APF directs our attention are less on point. In *Randall v. Sorrell* the Supreme Court held that a provision of Vermont's campaign finance statute capping direct contributions to the governor at $200 per donor each election cycle was unconstitutional.[180] But contribution limits are more closely scrutinized than disclosure requirements. In *Citizens United*, the Supreme Court explained that "disclosure is a less restrictive alternative to more comprehensive regulations of speech," like spending limits.[181]

APF also cites two Tenth Circuit decisions holding that Colorado's registration and reporting requirements were unconstitutional as applied to groups spending less than $3,500 on a ballot measure, but the court's rationale in those cases

---

[177] 556 F.3d 1021, 1024, 1033-34 (9th Cir. 2009).

[178] *Id.* at 1024-25.

[179] *Id.* at 1034.

[180] 548 U.S. 230, 249-50, 262 (2006) (plurality opinion); *see also id.* at 264-65 (Kennedy, J., concurring in judgment) (agreeing that Vermont's contribution limits violated First Amendment); *id.* at 265-73 (Thomas, J., concurring in judgment) (same).

[181] *Citizens United v. FEC*, 558 U.S. 310, 369 (2010).

relied heavily on the particular burdens of Colorado's disclosure regime.[182] APF does not address the particular burdens of Alaska's disclosure regime; it challenges only the public's interest in knowing about those making low-cost speech.

And in *Vote Choice, Inc. v. DiStefano*, the First Circuit struck down Rhode Island's disclosure law on associational grounds because its "disparity between the first dollar disclosure threshold applicable to those who choose to pool money by making contributions to [political action committees] and the $100 disclosure threshold applicable to those who choose to act alone by making direct contributions and expenditures" did not satisfy exacting scrutiny.[183] But the court did not conclude that the low thresholds were unjustified absent such a disparity. It "decline[d] to rule out categorically the legislative tool of first dollar disclosure," stating, "that tool may in certain contexts . . . serve sufficiently compelling government interests to be upheld."[184]

In APF's view, Alaska's statutes, which (with the exceptions mentioned above) are triggered by the first dollar spent, are unconstitutional as applied to its communications because its expenditures were minimal. "[A]n as-applied

---

[182]    *See Sampson v. Buescher*, 625 F.3d 1247, 1251, 1259-61 (10th Cir. 2010) (holding "substantial" burden that Colorado's complicated and prolific campaign disclosure laws — from varied legal sources and which "[t]he average citizen [could not] be expected to master" — imposed on neighborhood group was unconstitutional in light of interest in promoting disclosure); *Coal. for Secular Gov't v. Williams*, 815 F.3d 1267, 1277 (10th Cir. 2016) ("Colorado's issue-committee regulatory framework remains too burdensome for small-scale issue committees . . . .").

[183]    4 F.3d 26, 33-36 (1st Cir. 1993); *see id.* at 29 (describing Rhode Island's "first dollar disclosure" requirement as "the duty to disclose the identity of, and the amount given by, every contributor, no matter how modest the contribution").

[184]    *Id.* at 36.

[constitutional] challenge requires evaluation of the facts of the particular case in which the challenge arises."[185]

The facts do not show that APF's spending was so minimal that the public had no interest in knowing who funded it. APF maintains that the Commission "failed to introduce evidence that expenditures on any communication individually was more than negligible." But the Commission found that APF spent $643.20 on unreported expenditures, and APF acknowledges this finding is based on its discovery response to Commission staff averring that APF spent $643.20 on "staff time to review educational content, send out press releases, etc." related to ranked-choice voting between September 1, 2019 and September 8, 2020.

The lack of more granular findings or evidence is not the Commission's fault. Although APF argued to the Commission that "low thresholds" are constitutionally suspect, it supplied no evidence showing that any of its expenditures were *de minimis*.[186] Instead it argued that the Commission could avoid the constitutional issues "inherent to the low thresholds" by construing its statutes in a way that did not apply to APF's speech. And APF did not attempt to present such evidence to the superior court on appeal.[187]

Based on the facts we do have, we cannot say APF's spending on speech was so minimal that the public lacked an interest in knowing who funded it. As the

---

[185]    *Alaska Pub. Offs. Comm'n v. Patrick*, 494 P.3d 53, 56 (Alaska 2021) (second alteration in original) (quoting *Dapo v. State, Off. of Child.'s Servs.*, 454 P.3d 171, 180 (Alaska 2019)).

[186]    Commission staff had requested APF "provide a list of all purchases, transfer of money or anything of value . . . made for the purpose of furthering APF's mission in connection with ranked choice voting." APF responded by providing the lump sum figure.

[187]    *See* Alaska R. App. P. 609(b)(1) (authorizing superior court to grant motion for trial de novo in whole or in part in appeal from administrative agency decision).

superior court pointed out, the time period to which the $643.20 expenditure pertained did not include the October 8 press release or the October 12 blog post.[188]  Therefore, all we know is that a portion of the $643.20 in staff time was spent on the July 24 press release and the July 31 YouTube video.[189]  APF invites us to assume that "reposting materials from other sources could not have incurred more than minimal costs," but that is not apparent from the record.  Rather, the record indicates that APF expended almost $650 in staff time on an effort to publish materials it describes as "reposted."  This sum is not all that surprising.  APF did not just happen to find a video on the internet and share it on social media.  APF engaged in discussions with organizations around the country to create a national coalition that developed or gathered content on ranked-choice voting and allowed APF to republish that content.  Such efforts required significant time, and someone paid for that time.  Alaskans have a genuine interest in knowing who.

APF's spending is not negligible, unlike the in-kind contributions made by the pastor in *Canyon Ferry Road Baptist Church*.[190]  Although "expending a few moments of a[n employee's] time" to repost a video to a business's social media page

---

[188]  There is no finding or evidence on how much APF spent on producing the two later communications at issue in this case.  We might assume that an opinion piece produced by an intern cost a negligible amount, but we do not know what staff time or other expenditures were involved.  Although the first-dollar threshold for statutory reporting, registration, and disclosure requirements gives us pause (even acknowledging the exemptions for individual speakers), there is an insufficient factual predicate for us to rule that these statutes were unconstitutional as applied to this speech.

[189]  Some portion was presumably also spent on "reposting" an opinion piece about ranked-choice voting in February 2020.  As noted above, the Commission did not treat that as subject to regulation, and the parties' arguments do not focus on the opinion piece.

[190]  *See* 556 F.3d 1021, 1033-34 (9th Cir. 2009).

might present a different case,[191] APF's expenditures were more substantial.  One can readily imagine an election-related advertisement, costing an amount similar to what APF spent, going viral on social media at the height of election season.  "[D]isclosure permits citizens . . . to react to the speech of corporate entities in a proper way.  This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages."[192]  Given the interests at stake and the record in this case, we reject APF's argument that its expenditures were so minimal that Alaska's reporting and disclosure requirements cannot constitutionally be applied to them.[193]

Finally, we note APF's assertion that Alaska's disclosure statutes are facially unconstitutional but hold that APF waived this argument with inadequate briefing.  In the First Amendment context, a law burdening speech "may be invalidated as overbroad" because "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."[194]  APF does not even recite this standard, let alone attempt to explain why it is met.  It makes no attempt to explain

---

[191]     *Cf. id.* at 1034 (holding that "a few moments" of employee's time and "marginal" space given to ballot petition was "so lacking in economic substance" to make disclosure requirements insufficiently related to information interest).

[192]     *Citizens United v. FEC*, 558 U.S. 310, 371 (2010).

[193]     The Commission declined to levy a monetary penalty against APF.  The Commission cited 2 AAC 50.865(b)(5), which provides that a penalty may be reduced or waived entirely if it is "significantly out of proportion to the degree of harm to the public for not having the information," which includes when the penalty "exceeds the value of the transactions that were not reported."  We do not view the Commission's decision to waive the penalty in this case as a concession that the public inherently lacks an interest in disclosure of this amount of election-related spending.

[194]     *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)); *see also Parker v. Levy*, 417 U.S. 733, 760 (1974) (explaining facial invalidation "inappropriate" when majority of statute covers "whole range of easily identifiable and constitutionally proscribable" conduct despite impermissibly burdening speech in "marginal applications" (quoting *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 580-81 (1973))).

what the dollar threshold demarcating the statute's "plainly legitimate sweep" might be, nor does it attempt to explain why we should conclude there is a comparatively substantial number of speakers who do, or would, spend small amounts of money on ballot proposition speech but do not fall under the existing statutory exemptions. "[S]uperficial briefing and failing to cite any authority constitute abandonment of a point on appeal."[195]  Given APF's deficient briefing on this point, we do not decide whether Alaska's campaign finance statutes should be struck down in their entirety because of their first-dollar thresholds.

> **2.      Requiring APF to post disclosures on communications that included speech by others is substantially related to the government's interest in an informed electorate.**

APF also argues that applying the disclosure requirement to what it describes as "reposted" materials will not promote an informed electorate but will instead mislead and confuse voters.  Specifically, APF argues that applying AS 15.13.090's "paid for by" disclosure to the July 24, 2020 press release and the Protect My Ballot YouTube video would confuse voters by "forc[ing] APF to take credit for others' communications."

We question the premise that the communications APF describes are "others' communications."  The press release was emailed to media contacts by APF's executive director.  Its dateline announced it was sent from Anchorage.  The press release describes APF as the leader of the four-group coalition launching the "Protect My Ballot" campaign and includes a quote from APF's executive director stating that "[a]s Alaskans take to the polls in November, history should provide a warning for what Ranked Choice Voting would lead to."  Although the press release includes messages from other speakers, APF broadcasted it and contributed time and money to produce it.

---

[195]     *Wilkerson v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 993 P.2d 1018, 1021 (Alaska 1999).

As for the video, although it appears to have been first posted on the website of Protect My Ballot, APF republished the video on its website and its YouTube channel.[196] When the video is viewed on APF's website, it displays a header with APF's logo alongside the title and appears below APF's name and a statement of its vision for Alaska.[197] Therefore, we do not agree that these communications can be described as merely others' speech.

For that reason, we are not persuaded by APF's argument that the law requiring APF to add a disclosure to these communications lacks a substantial relationship with the interest in an informed electorate. Curating and broadcasting speech first produced by others may involve time, effort, and financial resources. APF's publication of the video boosted its reach and literally placed its name on the message, heightening its salience for the Alaska audience. In the same way that voters have an interest in knowing who is paying to produce speech meant to influence the outcome of an election, they have an interest in knowing who is paying to broadcast that speech to more listeners. Therefore, voters have an interest in knowing who financially supports APF's efforts to broadcast messages opposing an issue on the ballot in the upcoming election.[198]

Nor are we persuaded that the risk of confusion created by having to post a disclosure on the press release and video was so great that the requirement lacks a

---

[196] Alaska Policy Forum, *Ranked Choice Voting, Explained*, YOUTUBE (July 31, 2020), https://www.youtube.com/watch?v=-JYbr-ctFds (archived at https://perma.cc/4PH3-Z9VW).

[197] *Video: Ranked Choice Voting, Explained*, ALASKA POL'Y F. (July 31, 2020), https://alaskapolicyforum.org/2020/07/video-rcv-explained/ (archived at https://perma.cc/4PH3-Z9VW).

[198] We again point out that individuals and nongroup entities who "repost" others' speech using the internet are exempt from the need to post a disclosure because the definition of a "communication" that requires a disclosure excludes speech costing less than $500 by individual and nongroup entities. AS 15.13.400(3).

substantial relationship to the government's interest in an informed electorate. The text of the disclosure statute has a specific rule for "a communication that includes a . . . video component."[199] Such a communication must display a specific message onscreen during the entirety of the communication:

> This communication was paid for by (person's name and city and state of principal place of business). The top contributors of (person's name) are (the name and city and state of residence or principal place of business, as applicable, of the largest contributors to the person under AS 15.13.090(a)(2)(c)).[200]

APF argues that having to post this disclosure on the page where it displayed the video would confuse voters as to who actually made the communication. We are not convinced.

The "communication" to which the disclosure applies is APF's dissemination of the video on its webpage and YouTube channel, where APF has appended its own name, logo, and commentary to the video. The fact that APF expended resources to obtain and publish the video on its website makes it accurate to say that APF paid for that communication. This is true even if someone else paid to produce the video and let APF use it without charge. Perhaps that nuance will be lost on some viewers, who may assume that the video itself was produced or paid for by APF. But the possibility of such confusion does not undermine the purpose of the disclosure statute, which is to give the public information about who is financially backing or opposing candidates and ballot initiatives. For that reason, we are not

---

[199]   AS 15.13.090(c).

[200]   *Id.* During the hearing, the Commission's staff explained its position as to how the disclosure should be posted in the context of a newspaper opinion piece reposted on APF's website. Staff stated that the disclosure would have to appear on the web page where the opinion piece was republished, rather than on the opinion piece itself. Although staff did not address this point in relation to the video, we presume the same rule would apply.

persuaded that applying the disclosure requirement to APF's "reposted" communications lacks a substantial relationship with the State's interest in an informed electorate.

### 3. APF's narrow tailoring arguments are not persuasive.

APF argues that AS 15.13.090's disclosure requirement is not narrowly tailored because there are less burdensome approaches to inform the public who pays for communications. Specifically, APF argues that the State could accomplish its goals by adding an "earmarking" requirement to the statute,[201] or "keep[ing] a public database for everyone to look up the information" about a speaker's funding sources.

Narrow tailoring means "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served.' "[202] The State "is not free to enforce *any* disclosure regime that furthers its interests. It must instead demonstrate its need for universal production in light of any less intrusive alternatives."[203] Narrow tailoring does not, however, require that a legislature choose the least restrictive means of achieving its ends.[204]

The Supreme Court upheld disclosure requirements in *Citizens United*, observing that they represent "a less restrictive alternative to more comprehensive regulations of speech."[205] And Alaska's reporting statute carves out some common

---

[201] Earmarking requirements make disclosure necessary only for donors who have specifically designated their contributions for election-related purposes. *See Indep. Inst. v. Williams*, 812 F.3d 787, 797 (10th Cir. 2016).

[202] *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014) (plurality opinion) (quoting *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).

[203] *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 613 (2021) (emphasis in original).

[204] *Id.* at 608.

[205] *Citizens United v. FEC*, 558 U.S. 310, 369 (2010).

types of paid speech from regulation. Disclosures are not required on speech disseminated through print or broadcast media if it costs $500 or less and is by a natural person or nongroup entity.[206] Nor are disclosures required on printed materials like billboards, pamphlets, or signs paid for by a natural person acting independently to influence a ballot measure election.[207] As for reporting of expenditures, individual spending of up to $500 on printed materials related to ballot propositions is exempt from reporting.[208] So some paid speech is not subject to reporting or disclosure requirements at all.

The Commission also interprets AS 15.13 as already containing an earmarking provision, although the statute does not explicitly describe it as such. Under AS 15.13.090 all "communications" must include the words " 'paid for by' followed by the name and address of the person paying for the communication."[209] If the speaker is not an individual, the disclosure must also include the "three largest contributors under AS 15.13.040(e)(5)" during the twelve-month period predating the communication.[210] Alaska Statute 15.13.040(e)(5) imposes reporting requirements for "contributions made to the person, if any, for the purpose of influencing the outcome of an election." "Contribution" is separately defined as a donation "made for the purpose of . . . influencing the nomination or election of a candidate . . . [or] influencing a ballot proposition or question."[211] So not all donations to the entity qualify as "contributions" that require the donor be disclosed.

---

[206]     AS 15.13.400(3).

[207]     AS 15.13.090(b).

[208]     AS 15.13.040(h).

[209]     AS 15.13.090(a).

[210]     AS 15.13.090(a)(2)(C).

[211]     AS 15.13.400(4)(A)(i)-(ii).

Consistent with the Commission's position that not all donations to an entity are reportable "contributions," the Commission notes that statute and regulation allow APF to segregate donations earmarked for election activity in a separate account for reporting purposes to avoid reporting donations not intended for such purposes.[212] Under the Commission's interpretation, only donations earmarked for election-related uses must be reported; those who do not earmark donations for that purpose may avoid being identified.[213]

APF did not dispute the Commission's interpretation of its statutes or regulations or argue that this interpretation is constitutionally deficient. And we agree with the Commission's argument that the provisions in question can be interpreted as it describes. So we reject APF's argument that AS 15.13 fails exacting scrutiny for lack of earmarking. And because APF has made no argument that the particular approach to earmarking described in statute is insufficiently tailored, we do not address that precise issue.

We also reject APF's argument that requiring communications to include a disclosure is not narrowly tailored because the State could instead maintain a repository of donor information that voters can consult to discover who is funding what speech. APF relies on the Ninth Circuit's decision in *American Civil Liberties Union of Nevada v. Heller*[214] and the Supreme Court's decision in *National Institute of Family & Life Advocates v. Becerra*.[215]

To the extent that the *Heller* decision held that an on-message disclosure is compelled speech that violates the First Amendment,[216] it was undercut by the

---

[212] AS 15.13.052; 2 AAC 50.270(e).

[213] 2 AAC 50.270(e).

[214] 378 F.3d 979 (9th Cir. 2004).

[215] 585 U.S. 755 (2018).

[216] *See Heller*, 378 F.3d at 988-1000.

Supreme Court in *Citizens United*, which subjected an on-message disclosure requirement to exacting scrutiny and found the requirement narrowly tailored to the government interest in promoting an informed electorate.[217] And the Ninth Circuit has since rejected an argument that an on-message disclosure requirement was not narrowly tailored because the required information could be made available in an online database.[218] In *Smith v. Helzer*, the Ninth Circuit reasoned that on-advertisement donor disclosures " 'provide[] an instantaneous heuristic by which to evaluate generic or uninformative speaker names' and therefore more effectively serve[] the government's informational interest than an online database."[219] We agree with this view. On-message disclosures are more likely to effectuate the purpose of an informed electorate than a government repository of the same information.

The *National Institute of Family & Life Advocates* decision is not on point. The government interest at stake was entirely different, making the decision's reasoning inapplicable here. In that case the Supreme Court struck down a California law requiring pro-life pregnancy centers to post government-drafted notices about the availability of state-sponsored pregnancy services, including abortion — "the very practice [the] petitioners [were] devoted to opposing."[220] The asserted government interest for the notice requirement was "providing low-income women with information about state-sponsored services."[221] The Court struck down the notice requirement,

---

[217]     *Citizens United v. FEC*, 558 U.S. 310, 366-67 (2010).

[218]     *Smith v. Helzer*, 95 F.4th 1207, 1220 (9th Cir. 2024) (discussing *No on E v. Chiu*, 85 F.4th 493, 509 (9th Cir. 2023)).

[219]     *Id.* (quoting *Gaspee Project v. Mederos*, 13 F.4th 79, 91 (1st Cir. 2021)).

[220]     *Nat'l Ins. of Fam. & Life Advocs.*, 585 U.S. at 766.

[221]     *Id.* at 773.

reasoning that it was not closely tailored to the asserted interest because the government "could inform the women itself with a public-information campaign."[222]

But in the case at hand, a public database of speakers and their contributors would not be as effective in promoting the government's interest in an informed electorate. Unlike in *National Institute of Family & Life Advocates*, where the interest motivating the notice requirement was in promoting information about health resources generally, here the government interest is in informing voters of the funding sources behind a particular message. On-advertisement disclosures can be "more effective in generating discourse that facilitates the ability of the public to make informed choices in the specialized electoral context" in addition to being "a more efficient tool [than public disclosure] for a member of the public who wishes to know the identity of the donors backing the speaker."[223] So a public repository of funding information is not a substitute for on-message disclosure.

Therefore, we are not persuaded by APF's tailoring arguments. Its argument that Alaska's reporting and disclosure statutes violate the First Amendment fails.

## V.    CONCLUSION

For the foregoing reasons we AFFIRM the judgment of the superior court.

---

[222]    *Id.* at 773, 775.

[223]    *Gaspee Project*, 13 F.4th at 91; *see also Smith*, 95 F.4th at 1219-20 (rejecting challenge to on-message disclosure requirement when information was available online because on-message disclosures more efficiently and effectively serve government's informational interest).

**APPENDIX**

10/10/2020      Protect My Ballot: New Campaign Exposes Flaws in Ranked Choice Voting - Protect My Ballot

 **PROTECT MY BALLOT**

What is RCV?   Problems with RCV   RCV Repealed

Facts vs Fiction   Media

 JULY
**24**
2020

# Protect My Ballot: New Campaign Exposes Flaws in Ranked Choice Voting

Media    Press Release    0 💬

*Coalition of state think tanks, led by Alaska Policy Forum, educates on pitfalls of this convoluted voting scheme*

**Anchorage, Alaska (Friday, July 24, 2020)**—Today, a coalition of state-based think tanks, led by Alaska Policy Forum, launched the national education campaign Protect My Ballot. The campaign details the harmful consequences of an electoral scheme known as Ranked Choice Voting (RCV).

The campaign highlights bipartisan opposition to RCV—ranging from California Governor Gavin Newsom, to Alaska's former Democratic Senator Mark Begich, to members of the NAACP New York State Conference—along with a list of localities that have repealed RCV.

View the campaign website at ProtectMyBallot.com. View a brief explainer video on Ranked Choice Voting here.

**ARCHIVES**

October 2020

September 2020

August 2020

July 2020

**CATEGORIES**

Media

**META**

Log in

Entries feed

Comments feed

WordPress.org

https://protectmyballot.com/protect-my-ballot-new-campaign-exposes-flaws-in-ranked-choice-voting/      1/6

Exc. 060      SOA 000108    Exhibit 14
Page 1 of 6

Unlike a traditional election where voters select one candidate and the candidate with the most votes wins, under RCV, voters are expected to rank candidates. If no candidate receives a majority of votes in the first round of counting, the candidate with the fewest votes is eliminated. The process repeats until a remaining candidate receives a majority of votes.

This confusing process leads to many unintended consequences. For instance, if a voter misunderstands the process or chooses not to rank all candidates, her ballot could be eliminated from consideration. It's as though she never showed up on election day. That may explain why a handful of jurisdictions that previously adopted and tested RCV, have since repealed it.

Research also casts doubt on proponents' claims about the benefits of RCV. According to research from Jason McDaniel, an associate professor of political science at San Francisco State University, voter turnout decreased (three to five percentage points on average) in cities where RCV was used.

Coalition members released the following statements:

Bethany Marcum, Executive Director at Alaska Policy Forum:

"As Alaskans take to the polls in November, history should provide a warning for what Ranked Choice Voting would lead to. Not only can Ranked Choice Voting cause votes to be discarded, research shows it also decreases voter turnout. We need to encourage Americans of all backgrounds to visit the polls, not give them another reason to avoid casting a ballot."

Exc. 061    **SOA 000109**    Exhibit 14
Page 2 of 6

 
Annette Meeks, Founder and CEO of the Freedom Foundation of Minnesota:

"Public participation in elections is vital for a democracy to work. Discouraging and complicating the system threatens the people's voice. That's why a bipartisan coalition of citizens and legislators wants to ban ranked choice voting in Minnesota."

Trent England, Executive Vice President of the Oklahoma Council of Public Affairs:

"Ranked Choice Voting is not the solution for election reform. In Oklahoma, our Chief Election Official has opposed this system. Not only does it disenfranchise voters, but implementing it in Oklahoma would be a logistical nightmare."

Matthew Gagnon, CEO of Maine Policy Institute:

"Whether you examine data captured during Maine's brief experience with ranked-choice voting or the experiences of other jurisdictions, the lofty claims used to sell this voting system to the general public do not withstand factual scrutiny. Voters should be skeptical when they hear from special interest groups trying to change the way we exercise our sacred right to vote."

*Protect My Ballot coalition members include Alaska Policy Forum, Maine Policy Institute, Freedom Foundation of Minnesota, and the Oklahoma Council of Public Affairs.*

Exc. 062      **SOA 000110**    Exhibit 14
Page 3 of 6



**ALASKA POLICY FORUM**

**For Immediate Release**
**October 8, 2020**

**Contact: Melodie Wilterdink**
**(410) 725-9079**
**Melodie@AlaskaPolicyForum.org**

# NEW STUDY EXPOSES ALARMING RAMIFICATIONS TO RANKED-CHOICE VOTING

**ANCHORAGE, Alaska** — Alaska Policy Forum has released a new report detailing the findings of an extensive study that exposes many flaws in ranked-choice voting (RCV), particularly how the method of determining a winner results in discarded ballots, how RCV elections do not result in a majority winner, and how it can completely change the outcome of an election.

The study analyzed data from 96 elections in which RCV necessitated additional rounds of tabulation, and the results were disturbing. In some races, nearly 18 percent of votes were not counted in the winner-determining round of tabulation. Known as ballot exhaustion, the discarding of ballots is inherent to the ranked-choice voting process.

> **"A voting system that frequently results in the discarding of legally submitted ballots has no place in Alaska or anywhere else in the United States. After researching candidates, going to the polls, and voting, no Alaskan should have to worry that their ballot won't be counted in the final tally."**
> — Melodie Wilterdink, VP of Operations & Communications at Alaska Policy Forum

The study, completed in conjunction with Maine Policy Institute, also found that RCV frequently does not result in majority winners, as proponents claim. In fact, in nearly 40 percent of the elections analyzed, the "winner" received less than 50 percent of the total votes cast.

Perhaps most importantly, the study examined how often RCV would produce a different electoral outcome, and found that in 17 percent of the elections analyzed, RCV resulted in a different outcome than a traditional plurality election would have.

The full report is available at http://alaskapolicyforum.org/2020/10/failed-experiment-rcv/.

#### ####

Alaska Policy Forum (APF) is a 501(c)(3) nonprofit, nonpartisan think tank dedicated to empowering and educating Alaskans and policymakers by promoting policies that grow freedom for all. APF does not accept any form of government funding. To learn more about APF, visit www.AlaskaPolicyForum.org.

Exc. 066       **SOA 000123**   Exhibit 22
Page 1 of 1   000411

# Ranked-Choice Voting Disenfranchises Voters

Published on **October 12, 2020** (https://alaskapolicyforum.org/2020/10/rcv-disenfranchises-voters/) by Guest Author (https://alaskapolicyforum.org/author/infoapf/)

**By Johan Soto**

A voting trend to uproot the electoral process is sweeping the country and has made it all the way to Alaska: ranked-choice voting (RCV). While the current electoral process of one person, one vote is straightforward with little to no confusion, RCV threatens to complicate voting, ultimately disenfranchising voters and decreasing turnout.



Underlying any legitimate election is the promise of a fair and equal process for every voter However, RCV does not guarantee such a process With RCV, voters are asked to rank candidates (https://alaskapolicyforum.org/2020/07/video-rcv-explained/) from their most to least favored rather than voting for one candidate who best represents their values. If no candidate receives at least 50 percent of first-preference votes, the candidate with the fewest first-preference votes is eliminated from contention For the ballots with that candidate ranked first, the second-choice candidate is then included in the vote tabulation This process of eliminating the least popular candidates continues until one candidate has received a majority of the remaining votes cast. Unsurprisingly, this convoluted process leads to various adverse consequences for voters.

First is the confusion (https://mainepolicy.org/wp-content/uploads/RCV-Final-Booklet-.pdf) RCV creates for voters. For many, RCV is a new concept, and it increases the potential for voters to make mistakes. Proponents argue that this is a temporary inconvenience and that a program to educate the public would eventually resolve this. However, as evidenced by Maine's 19-page guide (https://www.wiscasset org/uploads/originals/rankchoicevoting.pdf) for RCV, these efforts may be equally confusing. Additionally, an education program only addresses the process of filling out the ballot. But a potentially more complicated and time-consuming process for voters is determining which candidates they favor the most, least, second most, and second least. Rather than supporting one candidate, they must effectively support all of them but to varying degrees. And if voters choose to abstain from supporting certain candidates, their ballots could potentially be discarded and not counted in the final tally.

The discarding of ballots, known as ballot exhaustion, is a problem inherent to RCV. As mentioned above, a voter who does not rank all of the candidates risks losing his vote to ballot exhaustion. If voters can rank up to four candidates, for example, but Mr Smith ranks just two, both of his candidates could be eliminated through the tabulation process if they receive the fewest number of votes in the first and second rounds before one candidate receives at least 50 percent of

Exc. 068     **SOA 000153**    Exhibit 26
Page 2 of 4   000413

10/14/2020    Ranked-Choice Voting Disenfranchises Voters – Alaska Policy Forum

the remaining votes. In that case, Mr. Smith's ballot would be discarded, and he would not have a vote in the final round of tabulation, which determines the winner of the election. Also, incorrectly filled out ballots are often discarded. One study (https://www.sciencedirect.com/science/article/pii/S0261379414001395) of over 600,000 ballots found that ballot exhaustion in some elections reached as high as 27 percent of the total count. Ballot exhaustion such as this disenfranchises voters and would raise concerns over the legitimacy of elections in Alaska.

Other localities that have tried RCV have already experienced this disenfranchisement. After San Francisco implemented RCV, voter turnout among black voters, white voters, younger voters, and voters without a high school education decreased (https://news.sfsu.edu/news-story/ranked-choice-voting-linked-lower-voter-turnout). In both Oakland (http://hawaiifreepress.com/Portals/0/Article%20Attachments/Racial%20and%20Ethnic%20Disparities%20in%20RCV.pdf) and Minneapolis (https://www.startribune.com/ranked-choice-voting-hurts-minneapolis-minorities/195463981/?refresh=true), voters in predominately minority precincts were less likely to fully utilize their ballots, making ballot exhaustion more likely.

It should come as no surprise that in many of the districts that have tried RCV, voters have chosen to repeal it. In Aspen, Colorado, RCV was implemented in 2009, but it proved to be an unpopular and inefficient system. Just one year later, 65 percent of Aspen voters chose to repeal (https://www.aspendailynews.com/city-voters-repeal-irv/article_5d3a9245-bfc1-55db-947b-fefdb87031ea.html) the system. In Burlington, Vermont, a similar response was seen after voters repealed (https://archive.vpr.org/vpr-news/burlington-voters-repeal-instant-runoff-voting/) RCV for mayoral elections in 2010. These frustrations can still be seen today in states such as Maine where there is an ongoing (https://www.pbs.org/newshour/politics/ranked-voting-in-presidential-election-put-on-hold-in-maine) effort to repeal RCV.

Ultimately, other cities and states should serve as an example of the complications that arise from implementing RCV. It is critical for our country that elections maintain their integrity, and disenfranchising voters through RCV accomplishes the opposite. All Alaskans deserve to have their votes counted. To learn more about RCV visit ProtectMyBallot.com (https://protectmyballot.com/).

**********

Johan Soto is the Fall 2020 Policy Analysis Intern at Alaska Policy Forum. He is currently studying nuclear science and engineering at the Massachusetts Institute of Technology.

Blog (https://alaskapolicyforum.org/category/blog/), Front Page Slider (https://alaskapolicyforum.org/category/news/), Other Issues (https://alaskapolicyforum.org/category/other-issues/) elections (https://alaskapolicyforum.org/tag/elections/), Ranked-Choice Voting (https://alaskapolicyforum.org/tag/ranked-choice-voting/), RCV (https://alaskapolicyforum.org/tag/rcv/)

Previous
Press Release: New Study Exposes Alarming Ramifications to Ranked-Choice Voting

(https://alaskapolicyforum.org/2020/10/pr-ranked-choice-voting/)

https://alaskapolicyforum.org/2020/10/rcv-disenfranchises-voters/    3/4

Exc. 069          **SOA 000154**    Exhibit 26
Page 3 of 4